236 F.3d 1320 (Fed. Cir. 2001)
 THE HUMANE SOCIETY OF THE UNITED STATES, HUMANE SOCIETY INTERNATIONAL, and DEFENDERS OF WILDLIFE, Plaintiffs-Appellants,
v.
WILLIAM J. CLINTON, President, NORMAN Y. MINETA, Secretary of Commerce, and MADELEINE K. ALBRIGHT, Secretary of State, Defendants-Appellees.
 99-1360
 United States Court of Appeals for the Federal Circuit
 DECIDED: January 4, 2001
 
 Appealed from: United States Court of International Trade Judge Judith M. BarzilayPatti A. Goldman, Earthjustice Legal Defense Fund, of Seattle, Washington, argued for plaintiffs-appellants.
 Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendants-appellees. With him on the brief were David W. Ogden, Assistant Attorney General; Lois J. Schiffer, Assistant Attorney General; and David M. Cohen, Director. Of counsel were Mark A. Brown, Attorney;James C. Kilbourne, Attorney; and M. Alice Thurston, Attorney. Also of counsel wereViolanda Botet, Attorney, U.S. Department of State, of Washington, DC; and Margaret Hayes, Attorney, Department of Commerce, of Washington, DC.
 Before CLEVENGER, Circuit Judge, PLAGER, Senior Circuit Judge,* and RADER,Circuit Judge.
 Opinion for the court filed by Senior Circuit Judge PLAGER. Circuit Judge RADER concurs in the result.
 PLAGER, Senior Circuit Judge.
 
 
 1
 The Humane Society of the United States, Humane Society International, and Defenders of Wildlife (collectively "Humane Society") appeal from a decision of the Court of International Trade. The Court of International Trade denied their request to issue a writ of mandamus directing the President to impose sanctions on Italy for violation of the Driftnet Fishing Act, 16 U.S.C. §§1826-1826g (Supp. IV 1998), and denied their request for an order requiring the Secretary of Commerce to rescind his certification that Italy had terminated large-scale driftnet fishing. The Court of International Trade did grant their petition regarding issuance of an order requiring the Secretary of Commerce, pursuant to 16 U.S.C. §1826a(b)(1)(B), again to identify Italy as a nation for which there is reason to believe its nationals or vessels are conducting large-scale driftnet fishing. Because the Court of International Trade did not err in its judgment, the judgment is affirmed.
 
 BACKGROUND
 
 2
 Large-scale driftnet fishing is defined in 16 U.S.C. §1826c(2)(A) as "a method of fishing in which a gillnet composed of a panel or panels of webbing, or a series of such gillnets, with a total length of two and one-half kilometers or more is placed in the water and allowed to drift with the currents and winds for the purpose of entangling fish in the webbing." A fishing boat deploys the driftnets by suspending them vertically beneath the surface of the water, between buoys at the ocean surface and a weighted lead line at the bottom of the nets. The driftnets are deployed at night when they are less visible to marine life. Though intended to catch fish, the nets indiscriminately catch virtually all aquatic life including fish, whales, dolphins, sea turtles, and sea birds. The fish are captured when the mesh catches behind their gills, and the whales, dolphins, and other air-breathing sea life are caught when they become entangled in the net. At dawn, fishermen collect the driftnets, remove the target fish, and discard any non-target species, often drowned, that were caught in the nets.
 
 
 3
 In 1991, the United Nations General Assembly passed numerous resolutions calling for a worldwide moratorium on large-scale high seas driftnets. The resolutions were aimed primarily at driftnet fishing in the area of the seas beyond what is known in international law as the Exclusive Economic Zone ("the EEZ"). The EEZ is the area of the seas that lies within 200 nautical miles from the shore of a coastal nation; the area beyond the EEZ is known as the high seas.
 
 
 4
 In implementing the resolutions, the United States passed the High Seas Driftnet Fisheries Enforcement Act, Pub. L. No. 102-582, 106 Stat. 4900 (1992) (codified as amended at 16 U.S.C. §§1826-1826g) (the "Driftnet Act"). The Driftnet Act establishes a process under which the United States may take various actions against a foreign nation whose fishing vessels on the high seas engage in large-scale driftnet fishing, as the Act defines it.[1] We will examine the provisions of the Act in detail below. For now, it will be enough to outline the way the Act works.
 
 
 5
 Whenever the Secretary of Commerce has reason to believe that the nationals or vessels of any nation are conducting large-scale driftnet fishing beyond the EEZ of any nation, the Secretary is to identify that nation, and notify the President and the nation of the identification. 16 U.S.C. §1826a(b)(1)(B).
 
 
 6
 Thereafter, the President is to enter into consultations with the government of the identified nation "for the purpose of obtaining an agreement that will effect the immediate termination of large-scale driftnet fishing by the nationals or vessels of that nation...." 16 U.S.C. §1826a(b)(2). If those consultations are not "satisfactorily concluded," the President is to order the Secretary of the Treasury to prohibit the importation into the United States of fish and fish products from that nation. 16 U.S.C. §1826a(b)(3)(A)(ii).
 
 
 7
 In addition, the Act provides that the Secretary of Commerce, after giving notice to the nations involved, is to publish periodically a list of nations whose nationals or vessels conduct large-scale driftnet fishing beyond the EEZ of any nation, and the Secretary of the Treasury shall thereafter deny entry of any such vessel to any place in the United States. 16 U.S.C. §1826a(a)(1)-(3). Denial of port privileges, as well as import sanctions if imposed, remain in effect until the Secretary of Commerce certifies to the President and the Congress that such nation has terminated large-scale driftnet fishing by its nationals and vessels beyond the EEZ. 16 U.S.C. §1826b.
 
 
 8
 In 1995, the Humane Society and other plaintiffs filed suit in the Court of International Trade. They alleged that, in the face of evidence to the contrary, the Secretary of Commerce had failed to identify Italy as a nation whose nationals or vessels conduct large-scale driftnet fishing in violation of the Driftnet Act. Humane Soc'y of the United States v. Brown, 901 F. Supp. 338, 345 (Ct. Int'l Trade 1995). Ultimately, the Court of International Trade agreed, and held that the Secretary of Commerce had reason to believe that Italian nationals were conducting large-scale driftnet fishing on the high seas and that, therefore, the decision not to identify was an abuse of discretion. Humane Soc'y of the United States v. Brown, 920 F. Supp. 178, 192-196 (Ct. Int'l Trade 1996). The Government did not appeal the decision. Pursuant to the trial court's decision, the Secretary of Commerce on March 28, 1996 identified Italy as a nation for which there was reason to believe its nationals or vessels were conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation, and notified the President of Italy's identification.
 
 
 9
 Acting through the Department of State, the President entered into consultations with Italy. In July 1996, the Italian government sent documents formalizing its agreement with the United States to end proscribed driftnet fishing by its nationals and vessels. The United States informed Italy that its proposals were sufficient to avoid the imposition of sanctions under the Driftnet Act. Thereafter, on January 7, 1997, the Secretary of Commerce certified to the President and Congress that Italy had terminated illegal driftnet fishing.
 
 
 10
 This case arose when, in 1998, pursuant to the authority of 28 U.S.C. §1581(i) (1994), the Humane Society plaintiffs brought another suit in the Court of International Trade against the President and the Secretary of Commerce. The suit asked for injunctive and declaratory relief. The Humane Society alleged that, despite the earlier agreement, illegal driftnet fishing by Italian nationals and vessels continued in the Mediterranean Sea in the 1997 and 1998 fishing seasons. The Humane Society requested the trial court to issue a writ of mandamus directing the President to impose sanctions on Italy based on the 1996 identification, enjoin the Secretary of Commerce to rescind his January 7, 1997 certification of termination by Italy, and, in the alternative, enjoin the Secretary of Commerce again to order that there is reason to believe that Italy is a nation whose nationals or vessels are continuing to conduct large-scale driftnet fishing beyond the exclusive economic zone.
 
 
 11
 The Humane Society moved for summary judgment and the Government defendants filed cross motions for summary judgment. The trial court held in favor of the Government regarding the consequences attributable to the 1995-97 events. The court held that the President's duty to decide if talks with Italy had "satisfactorily concluded" was discretionary, and declined to issue a writ of mandamus requiring sanctions. Further, the trial court found that the Secretary of Commerce's January 7, 1997 certification of termination was not arbitrary, capricious or an abuse of discretion, since talks with Italy had concluded in a formal agreement to end driftnet fishing.
 
 
 12
 With regard to the state of affairs at the time of trial, the trial court reviewed the evidence presented by the Humane Society, which included data provided by the Italian government indicating 59 administrative violations, 33 administrative seizures, and 98.5 kilometers of net seized for violations during 1997. In addition, the United States Navy had sighted several vessels, suspected of being Italian, which were presumed to be engaging in illegal driftnet fishing. Also, Greenpeace reported twenty driftnet vessels in March of 1997; in 1998, nine violations were confirmed.
 
 
 13
 On the basis of this evidence, the trial court held that the Secretary of Commerce's refusal to identify Italy a second time was arbitrary and capricious. The court ordered the Secretary of Commerce again to identify Italy, pursuant to §1826a(b)(1)(B), as a nation for which there is reason to believe that its nationals or vessels are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation, and to notify the President of that identification. The Humane Society plaintiffs appeal those parts of the decision of the trial court not in their favor.
 
 DISCUSSION
 
 14
 * Under Rule 56(d) of the United States Court of International Trade, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When reviewing such a decision by the Court of International Trade, we assess as a matter of law whether that standard was correctly applied. Campbell Soup Co. v. United States, 107 F.3d 1556, 1559 (Fed. Cir. 1997); St. Paul Fire & Marine Ins. v. United States, 6 F.3d 763, 767 (Fed. Cir. 1993).
 
 
 15
 Furthermore, this Court will apply the standard of review set forth in 5 U.S.C. §706 to an action instituted pursuant to 28 U.S.C. §1581(i). Miami Free Zone Corp. v. Foreign-Trade Zones Bd., 136 F.3d 1310, 1312-1313 (Fed. Cir. 1998); Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United States, 104 F.3d 1309, 1313 (Fed. Cir. 1997). Section 706 of title 5, United States Code, the Administrative Procedure Act ("APA"), provides that:
 
 
 16
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
 
 
 17
 (1) compel agency action unlawfully withheld or unreasonably delayed; and
 
 
 18
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be
 
 
 19
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 20
 (B) contrary to constitutional right, power, privilege, or immunity;
 
 
 21
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 
 
 22
 (D) without observance of procedure required by law;
 
 
 23
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
 
 
 24
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
 
 
 25
 In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
 
 
 26
 Applying this standard of review, an administrative action is to be upheld if the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choices made." Balt. Gas & Elec. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983). The Court has recognized that this standard is "highly deferential" to the administrative agency's factual findings. Shakeproof, 104 F.3d at 1313.
 
 II
 
 27
 It is important to understand that there are two separate actions by United States officials that are at issue, and two that are not. The two that are not are, first, the decision by the Court of International Trade that held arbitrary and capricious the failure of the Secretary of Commerce in 1995 to identify Italy as a nation about which there was reason to believe that her nationals or vessels were conducting high seas driftnet fishing. That judgment was not appealed, and resulted in the Secretary so identifying Italy, with the attendant consequences as specified in the Driftnet Act.
 
 
 28
 The second action not at issue is the order by the Court of International Trade, this time as part of the current litigation, overturning the Secretary's new negative decision regarding identification of Italy. The Court of International Trade concluded that there was again ample evidence of a "reason to believe" that Italy was in violation of the Act, and that the Secretary's refusal to identify Italy anew pursuant to §1826a(b)(1)(B) was arbitrary and capricious, and not in accordance with the Driftnet Act. The Government has not cross-appealed that decision by the Court of International Trade.
 
 
 29
 The two decisions that are challenged on appeal by the Humane Society plaintiffs are (1) the refusal by the trial court to order the President, after Italy was identified by the Secretary of Commerce pursuant to the court's 1996 Order, to direct imposition of import restrictions; and (2) the conclusion by the trial court that the Secretary's later certification, that Italy had terminated large-scale driftnet fishing, was not arbitrary and capricious.
 
 
 30
 The Humane Society argues that as a matter of law the President has a non-discretionary duty under the Driftnet Act to direct the imposition of import sanctions against nations whose nationals or vessels engage in large-scale driftnet fishing on the high seas, and this duty can be the basis for a writ of mandamus. The Humane Society also argues that the Secretary of Commerce, in certifying that Italy had terminated large-scale driftnet fishing based solely on an agreement that had not yet been fully implemented and without any evidence that the driftnet fishing had, in fact, ceased, had acted arbitrarily and capriciously.
 
 
 31
 The Government responds first that the Court of International Trade should not entertain a challenge to the Government's non-imposition of trade sanctions against Italy pursuant to the Driftnet Act because there has been no waiver of sovereign immunity by the United States. Second, even if the court concludes there has been such a waiver of sovereign immunity, argues the Government, the President's non-imposition of trade sanctions against Italy is rational and in accordance with law.
 
 
 32
 With regard to the Secretary of Commerce's 1997 certification that Italy had terminated large-scale driftnet fishing by Italian nationals and vessels, the Government argues the issue is moot in light of the new court order finding that Italy is again engaged in high seas driftnet fishing. Finally, the Government posits that, even if the 1997 certification has not been rendered moot, it was rational and in accordance with law.
 
 III
 
 33
 We first address whether, as the Government contends, in an action under §1581 to enforce the provisions of the Driftnet Act, the President and other executive officers are immune from suit under the doctrine of sovereign immunity. This is an issue of first impression. The trial court declined to address this issue on the grounds that, since the court was going to hold for the Government on the merits of the question of whether the President acted within his authority, there was no need to decide the question of sovereign immunity. But sovereign immunity goes to the issue of the court's power to hear the case, and therefore is antecedent to the merits of the case. See Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471-475 (1994) ("Sovereign immunity is jurisdictional in nature."). Thus, we must address this issue first.
 
 
 34
 The doctrine of sovereign immunity is an historic carryover from the days of the near-absolute power of the English kings. Essentially the doctrine prescribes that the sovereign--the Federal Government has long claimed status as such--cannot be brought into court and held liable for its wrongs against its citizens unless it first consents to be sued. See Louis L. Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 1-5 (1963).
 
 
 35
 Sovereign immunity and subject matter jurisdiction are related but different juridical concepts. Federal courts are courts of limited jurisdiction; they have only such jurisdiction as is granted to them by law, either by the Constitution or Congressional legislation. A grant of subject matter jurisdiction to a particular court, even one that grants jurisdiction over suits against the Federal Government itself, is not necessarily the same as a waiver of sovereign immunity. The question is whether a statute that grants particular jurisdiction to a court also serves as such a waiver, or whether, as the Government contends is the case here, a separate statutory waiver is needed. The answer depends on the particular statutory grant, and what can be ascertained about Congress's purpose and intent.
 
 
 36
 Chapter 95, 28 U.S.C., entitled "Court of International Trade," provides the authority in §1581 for "Civil actions against the United States and agencies and officers thereof." Subsection (i) of §1581 gives the Court of International Trade:
 
 
 37
 exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for...
 
 
 38
 (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
 
 
 39
 (4) administration and enforcement....
 
 
 40
 This is the provision under which the present Humane Society suit is brought.
 
 
 41
 The Government argues that 28 U.S.C. §1581(i) does not itself waive sovereign immunity. In support of its argument, the Government points to part of the legislative history of the Customs Court Act of 1980 which includes the statement that "subsection (i) is intended only to confer subject matter jurisdiction upon the court, and not to create any new causes of action not founded on other provisions of law." H.R. Rep. No. 96-1235, at 47 (1980), reprinted in 1980 U.S.C.C.A.N. 3729, 3759. The Government also refers to statements indicating that the intent of Congress in enacting §1581(i) was to eliminate the confusion that existed between the jurisdiction of the district courts and that of the Court of International Trade. Id.
 
 
 42
 The Government then cites to the standing provision governing the commencement of civil actions in the Court of International Trade which provides, in part, "[a]ny civil action of which the Court of International Trade has jurisdiction... may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5." 28 U.S.C. §2631(i). The Government cites to the legislative history of 28 U.S.C. §2631(i), which provides that "[t]his subsection is intended to correlate with and complement the broad grant of residual jurisdiction found in proposed section 1581(i)." H.R. Rep. No. 96-1235, at 52, 1980 U.S.C.C.A.N. at 3764. The Government concludes that a reading of these several provisions demonstrates that §1581(i) was not intended to create any new causes of action, and thus the waiver of sovereign immunity must be found elsewhere and that waiver must be in the APA.
 
 
 43
 The Humane Society answers that United States v. Boe, 543 F.2d 151 (CCPA 1976), and other portions of the legislative history of the Customs Courts Act of 1980 demonstrate that §1581 itself waives sovereign immunity. In Boe, the Court of Customs and Patent Appeals construed 28 U.S.C. §1582, the jurisdictional statute that was the predecessor of §1581. Id. Boe held that "[t]he consent of the sovereign to be sued in the Customs Court is found in 28 U.S.C. §1582, which both establishes and limits the jurisdiction of that court." Id. at 154. Thus, according toBoe that statute itself served as a waiver of sovereign immunity.
 
 
 44
 Congress, in enacting the Customs Courts Act of 1980, which changed the name of the Customs Court to the Court of International Trade and clarified the new court's jurisdiction, stated:
 
 
 45
 The purpose of this broad jurisdictional grant is to eliminate confusion which currently exists as to the demarcation between the jurisdiction of the district courts and the Court of International Trade. This provision makes it clear that all suits of the type specified are properly commenced only in the Court of International Trade.
 
 
 46
 H.R. Rep. No. 96-1235, at 47, 1980 U.S.C.C.A.N. at 3759. Therefore, argues the Humane Society, the change from §1582 to §1581 was merely intended to clarify those matters within the exclusive jurisdiction of the Court of International Trade, and thus did not serve as a withdrawal of the waiver of sovereign immunity held by Boe to be embodied in the grant of jurisdiction. Additionally, notes the Humane Society, that conclusion is supported by the numerous cases in which the Court of International Trade has since considered challenges to the actions of the President pursuant to the grant of jurisdiction in §1581(i). See, e.g., Florsheim Shoe Co. v. United States, 744 F.2d 787 (Fed. Cir. 1984); United States Sugar Cane Refiners Ass'n v. Block, 683 F.2d 399 (CCPA 1982); Kemet Elecs. Corp. v. Barshefsky, 976 F. Supp. 1012 (Ct. Int'l Trade 1997); Luggage & Leather Goods Mfrs. of Am., Inc. v. United States, 588 F. Supp. 1413 (Ct. Int'l Trade 1984).
 
 
 47
 We believe the Humane Society's reading of §1581 is the correct one. In addition to crediting the points raised by them, it is informative to look at another court with complementary subject-matter jurisdiction involving suits against the United States, the Court of Federal Claims. Pursuant to 28 U.S.C. §1491(a) (1994), the Tucker Act, the Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." As noted, the jurisdiction of the two courts is complementary: 28 U.S.C. §1491(b) states that "[n]othing herein shall be construed to give the United States Court of Federal Claims jurisdiction of any civil action within the exclusive jurisdiction of the Court of International Trade."
 
 
 48
 In United States v. Mitchell, 463 U.S. 206 (1983), the Supreme Court acknowledged that terminology employed in some of its prior decisions had generated some confusion as to whether the Tucker Act, in addition to granting jurisdiction to the Court of Claims (the predecessor to the Court of Federal Claims) over suits against the Federal Government, also constituted a waiver of sovereign immunity. Id. at 212. The Court reviewed the history of the Act, the prior decisions regarding it, and its legislative history. The Court quoted with approval the statement in the House Judiciary Committee report that the measure was designed "to give the people of the United States what every civilized nation of the world has already done--the right to go into the courts to seek redress against the Government for their grievances." Id. at 214. The conclusion the Court reached was that the jurisdictional grant carried with it the unequivocal waiver of sovereign immunity: "If a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit." Id. at 216.
 
 
 49
 We can see no basis for treating the grant of jurisdiction to the Court of International Trade in a manner different from that by which the jurisdictional grant to the Court of Federal Claims is treated. The same pattern exists--a specific grant of jurisdiction by the sovereign to a specific court for specific causes of action against the sovereign--with the same result--a determination of liability because of conduct by the sovereign's officials in the ordinary course of their assigned duties. Unless the grant of jurisdiction carries with it a coextensive waiver of sovereign immunity, the Congressional grant would be a hollow act, with no significant consequences to the sovereign, and no significant benefits to the sovereign's subjects.
 
 
 50
 Given the prior understanding of the predecessor act which both granted jurisdiction to the Court of International Trade and waived sovereign immunity, and the parallels to the Tucker Act, we follow the same approach taken by the Supreme Court and conclude that §1581 not only states the jurisdictional grant to the Court of International Trade, but also provides a waiver of sovereign immunity over the specified classes of cases. The Court of International Trade properly exercised jurisdiction over this case.
 
 
 51
 We note in passing that the Government, having assumed that §1581 does not constitute a waiver of sovereign immunity, looks instead in its brief to this court to §702 of the APA for the requisite waiver. That leads the Government into extensive consideration of standing under the APA. We need not go there; neither party raises the standing issue independently of the APA issue, and since we do not rely on the APA for its waiver of sovereign immunity, questions of standing under the APA are not before us.
 
 
 52
 Furthermore, courts have recognized the standing of organizations such as the Humane Society to bring suits against the Government to implement environmental legislation. See Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 n.4 (1986) ("[T]hey undoubtedly have alleged a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting, and this type of interest is within the 'zone of interests' protected by the Pelly and Packwood Amendments."); United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 685 (1973) (holding that the trial court did not err in denying motion to dismiss based on lack of standing because appellees sufficiently alleged "that their members used the forests, streams, mountains, and other resources in the Washington metropolitan area for camping, hiking, fishing, and sightseeing, and that this use was disturbed by the adverse environmental impact caused by the nonuse of recyclable goods brought about by a rate increase on those commodities"); see also 28 U.S.C. §2631 (general standing provision for suits under §1581).
 
 IV
 
 53
 We turn then to the first issue raised by the appellant Humane Society: whether the issuance of sanctions by the President pursuant to §1826a(b)(3)(A)(ii) is nondiscretionary, and thus the issuance of mandamus would be appropriate. As a general proposition, two requirements must be satisfied in order for a writ of mandamus to issue: 1) the plaintiff must have exhausted all avenues for relief; and 2) the defendant must owe the plaintiff a clear non-discretionary duty. Heckler v. Ringer, 466 U.S. 602, 616 (1984); see also Bobula v. United States Dep't of Justice, 970 F.2d 854, 859-60 (Fed. Cir. 1992) (relying on the Heckler standard). Here, it is uncontested that the Humane Society plaintiffs have satisfied the first requirement. Humane Soc'y of United States v. Clinton, 44 F. Supp. 2d 260, 268 (Ct. Int'l Trade 1998). Thus, the issue is whether the second requirement has been satisfied.
 
 
 54
 The Driftnet Act is not a model of clarity in statutory drafting. Not surprisingly, the parties find in the statute very different understandings. Part of the problem lies in the order in which the several sections of the Act are presented. The Act in section 101 (16 U.S.C. §1826a) begins by requiring that the Secretary of Commerce, not later than 30 days after enactment, "and periodically thereafter," publish a list of nations whose nationals or vessels conduct large-scale driftnet fishing beyond the EEZ. The Secretary of the Treasury "shall" then deny port privileges to any such nation's large-scale driftnet fishing vessels.
 
 
 55
 Subsection (b) of section 101 (16 U.S.C. §1826a(b), entitled "Sanctions" but actually containing extensive procedural requirements), requires the Secretary of Commerce, not later than January 10, 1993, and "[a]t any time after... whenever the Secretary... has reason to believe" that the nationals or vessels of any nation are conducting large-scale driftnet fishing beyond the EEZ, to (i) identify that nation, and (ii) notify the President of the identification. The President is then required to enter into consultations with the government of that nation "for the purpose of obtaining an agreement that will effect the immediate termination of large-scale driftnet fishing by the nationals or vessels of that nation beyond the exclusive economic zone of any nation." 16 U.S.C. §1826a(b)(2).
 
 
 56
 "The President[,]... if the consultations with the government of a nation under paragraph (2) are not satisfactorily concluded within ninety days, shall direct the Secretary of the Treasury to prohibit the importation into the United States of fish and fish products and sport fishing equipment [from such nation]...." 16 U.S.C. §1826a(b)(3)(A) (emphasis added).
 
 
 57
 The Humane Society contends that the only logical way to assess whether the negotiations have been "satisfactorily concluded" is by reference to the purpose of the negotiations--specifically, to determine objectively whether they "produce an agreement that will effectuate an immediate end to the illegal driftnet fishing." The Humane Society notes the evidence of continuing violations by Italian vessels as clear evidence that the President failed to act in accordance with the statutory standard. In the view of the Humane Society plaintiffs, if the agreement fell short, then the President was obligated to direct the Secretary of the Treasury to impose import sanctions. The Humane Society asks this court to remand the case to the trial court for its determination of the question of whether the agreement met that standard, and if the agreement did not, then to order the President to take the required action.
 
 
 58
 The Government responds that the phrase "satisfactorily concluded" refers to a highly subjective state of mind, such as 'to make happy,' or 'to please,' phrases taken from dictionary definitions of "satisfy." The Government further notes that, in cases in which international relations are concerned, the President plays a dominant role. In these matters, it is generally assumed that Congress does not set out to tie the President's hands; if it wishes to, it must say so in clear language. See United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 320 (1936) ("It is quite apparent that if, in the maintenance of our international relations, embarrassment... is to be avoided and success... to be achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved."); see also B-West Imps., Inc. v. United States, 75 F.3d 633, 636 (Fed. Cir. 1996) ("[S]tatutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed...."); Am. Ass'n of Exps. and Imps.-Textile & Apparel Group v. United States, 751 F.2d 1239, 1247 (Fed. Cir. 1985) (stating that, in the international field, "congressional delegations are normally given broad construction") (citing S. P.R. Sugar Co. Trading Corp. v. United States, 334 F.2d 622, 632 (Ct. Cl. 1964)).
 
 
 59
 In this setting, when Congress has chosen a broad and ill-defined phrase such as "satisfactorily concluded," this court cannot say with certainty that there is a fixed, measurable standard that limits the President's discretion. The agreement with Italy, negotiated on the President's behalf pursuant to the Act, consisted of six documents, covering a variety of enforcement practices and policies to which the Italian Government committed itself. Whether these commitments should have satisfied the President that they would effect the immediate termination of large-scale driftnet fishing by Italian vessels is a question of judgment about the good faith of the Italian government, and what is possible for the United States to demand and what will work. The fact that there is evidence of later, continuing violations is troubling, but the Act seems to allow for that possibility by providing for subsequent listing of a nation whose vessels or nationals again are in violation.
 
 
 60
 Furthermore, because of the broad discretion that is delegated to the President by Congress in §1826a(b)(3)(A), even without the added complication of the mandamus remedy, there would be serious doubt whether a court could review the President's determination of whether the consultations were "satisfactorily concluded." See Dalton v. Specter, 511 U.S. 462, 474-76, 477 (1994) ("Where a statute... commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available.");Florsheim Shoe Co. v. United States, 744 F.2d 787, 796 (Fed. Cir. 1984) ("In short, the presidential decision [in this case] is a 'multifaceted judgmental decision,' for which there is 'no law to apply.' After it is decided that the President has congressional authority for his action, 'his motives, his reasoning, his findings of facts requiring action, and his judgment are immune from judicial scrutiny.'").
 
 
 61
 We conclude that the trial court was correct when it held that the question of whether consultations were "satisfactorily concluded," and thus whether the requirement for import sanctions was triggered, is a matter that lies within the broad discretion of the President. Therefore, the trial court was also correct in finding that it cannot issue a writ of mandamus. Nothing in the facts of this case suggests that the President acted in other than good faith, or otherwise was in violation of his duties under the Act.
 
 V
 
 62
 The second issue raised is whether the Secretary of Commerce acted in violation of the Act when he certified in 1997 that Italy had terminated large-scale driftnet fishing. Here again the statute leaves something to be desired. Section 102 (16 U.S.C. §1826b) of the Act states in its entirety:
 
 
 63
 Any denial of port privileges or sanction under section 101 [16 U.S.C. §1826a, which includes the import sanctions] with respect to a nation shall remain in effect until such time as the Secretary of Commerce certifies to the President and the Congress that such nation has terminated large-scale driftnet fishing by its nationals and vessels beyond the exclusive economic zone of any nation.
 
 
 64
 The Act does not explain what evidence or circumstances should guide the Secretary in making this certification, or guide our determination of whether the Secretary's action is arbitrary or capricious.
 
 
 65
 The Government first attacks this issue by arguing, presumably even if the Secretary's action was in fact arbitrary or capricious, that the issue is now moot because the Court of International Trade has ordered the Secretary to identify Italy a second time, thus nullifying the previous certification. According to the Government, Italy is currently identified, and the statutory sanctions are in play. Therefore the court should not address the issue further.
 
 
 66
 The Humane Society points out that the problem with the Government's mootness argument is that it creates the possibility of an endless series of steps, beginning with identification of a nation whose vessels are in violation (perhaps at the instance of the court over the Secretary's objection), followed by a certification by the Secretary that the nation is complying, followed by, if further violations occur, another identification. Such a process may permit a noncomplying nation to escape close scrutiny, and places on interested parties like the plaintiffs the burden to constantly refile suits against the Secretary.
 
 
 67
 Article III of the United States Constitution limits federal judicial power to cases or controversies. NEC Corp. v. United States, 151 F.3d 1361, 1369 (Fed. Cir. 1998). "If a case becomes moot it no longer presents a justiciable controversy over which a federal court may exercise jurisdiction." Id. "'A case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" Id. (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)). However, a claim is not moot if that action is capable of repetition, yet evading review. Torrington Co. v. United States, 44 F.3d 1572, 1577 (Fed. Cir. 1995). See generally 13A Charles Alan Wright, Arthur Miller & Edward H. Cooper, Federal Practice and Procedure §3533.8 (2d ed. 1984) (discussing "capable of repetition, yet evading review" exception to mootness doctrine).
 
 
 68
 "To qualify for this exception, the challenged action must meet two conditions." Torrington, 44 F.3d at 1577. "First, the action must 'in its duration be too short to be fully litigated prior to its cessation or expiration.'" Id.(quoting Cambridge Lee Indus., Inc. v. United States, 916 F.2d 1578, 1581 (Fed. Cir. 1990)). "Second, there must be 'reasonable likelihood' that the party 'will again suffer the injury that gave rise to the suit.'" Id. (quotingCambridge, 916 F.2d at 1581).
 
 
 69
 In Torrington, Torrington appealed the trial court's determination that Torrington's challenge to the International Trade Administration's method of calculating the cash deposit rate for imported merchandise was moot. Id. at 1571. This court held that the trial court erred in determining the challenge was moot because that challenge fell within the exception to the mootness doctrine for recurring, short term conduct. Id. at 1578. The court reasoned that the International Trade Administration "can impose a new cash deposit rate before interested parties can fully litigate the method of calculating the cash deposit rate for the prior administrative review.... [L]itigation cannot keep pace with the rate of administrative reviews." Id. at 1578. The court also determined that "a reasonable likelihood exists that Torrington--currently an active participant in antidumping duty litigation--will face the same cash deposit rate issue again." Id.
 
 
 70
 In a memorandum date-stamped April 28, 1997, concerning "Procedural steps under the High Seas Driftnet Fisheries Enforcement Act," government attorneys recognized that the Driftnet Act did not explicitly address the situation if Italy was to continue or resume large-scale driftnet fishing after the Secretary's certification that driftnet fishing had ceased. The memorandum stated that it was possible to read the Act to require a new identification of Italy under §1826a(b)(1)(B) and a second round of consultations under §1826a(b)(2) before the Secretary could prohibit the importation of fish products from Italy. The memorandum also noted that such a process would appear to be incompatible with the purpose of the statute and could result in an annual cycle of agreements that appear to be adequate on paper but prove to be ineffectual in practice.
 
 
 71
 We can assume that, if a plaintiff was to challenge the Secretary's certification that a nation had ceased driftnet fishing and brought forth adequate evidence of persistent proscribed driftnet fishing, the Secretary would likely identify that nation again. Because of that re-identification, the challenge to the Secretary's prior certification would almost always be moot under the Government's theory. Thus, the question of the propriety of the Secretary's certification would escape judicial review. Even the Government's attorneys recognized that an ineffectual cycle of repetitious events could occur. We conclude that the purpose of the Act is better effectuated by holding that the question, whether the Secretary's certification that a nation has ceased driftnet fishing is in accord with law, is not rendered moot by a later re-listing or re-identification of that nation.
 
 
 72
 On the merits, the Humane Society argues that the Secretary's certification was based solely on the July 1996 agreement, and that the Secretary conducted no investigation of Italian driftnet practices. They argue further that the Secretary relied on the Secretary of State's announcement that an agreement had been reached, without independently scrutinizing that agreement to determine whether it would in fact effectuate an end to the illegal driftnet fishing. From this, the Humane Society concludes that any certification that fails to consider actual fishing practices must be struck down as arbitrary and capricious.
 
 
 73
 The Government acknowledges that the Secretary's sole stated reason for certifying that Italy has terminated large-scale driftnet fishing by its nationals and vessels was the agreement reached with the United States in 1996. The Government argues that this was reason enough to conclude that Italy had terminated such fishing. The fact that certain elements of the agreement remained to be implemented was immaterial, according to the Government, as was the fact that the State Department was urging Italy to pursue its enforcement program more vigorously. With regard to the Humane Society's allegations that illegal driftnet fishing had not ended, the Government argues that the record indicates that, between the conclusion of the July 1996 Agreement and January 1997, reports of illegal driftnet fishing were limited, sporadic, and unsubstantiated.
 
 
 74
 The trial court drew a distinction between the Secretary's decision to initially identify a nation under section 101 (16 U.S.C. §1826a) whose nationals or vessels are engaged in illegal driftnet fishing, and the Secretary's decision to certify under section 102 (16 U.S.C. §1826b) that a nation has terminated large-scale driftnet fishing. Humane Soc'y of the United States v. Clinton, 44 F. Supp. 2d 260, 271 (Ct. Int'l Trade 1999). The trial court viewed the focus in the first decision to be on the conduct of individuals and vessels, whereas the focus in the latter was on the conduct and intentions of the nation's government. We concur; this is a sensible way to parse the language of the Act and to understand the differences between the two decisions, and it illuminates the kind of inquiry appropriate to testing the Secretary's decision.
 
 
 75
 Accordingly, the trial court looked to the circumstances that prevailed in January 1997, when the certification was issued. The court concluded that the evidence supported the Secretary's determination that the agreement, though not fully implemented, was substantially so, and that adequate assurances had been given that it would be completed before the commencement of the 1997 fishing season. Given the court's focus, the fact that there may have been some individual violations by Italian vessels would not be determinative. The trial court concluded that in light of this analysis, it cannot be said that the Secretary's decision was so unreasonable as to be legally arbitrary and capricious. We concur in the trial court's analysis and conclusions; the trial court's ruling in that regard is upheld.
 
 
 76
 In sum: (1) Neither the President nor other executive officers are immune from suit under 28 U.S.C. §1581 with regard to their compliance with the provisions of 16 U.S.C. §1826; the grant of jurisdiction to the Court of International Trade under §1581 carries with it a co-extensive waiver of sovereign immunity. (2) The statutory standard governing the President's determination that consultations leading to an agreement with an identified nation have been "satisfactorily concluded" gives the President broad discretion; it is not a standard that comes within the reach of a mandamus action. (3) The determination in the form of a certification by the Secretary of Commerce that a nation has terminated the proscribed large-scale driftnet fishing is subject to judicial review under the statutory standard for review of such actions, focused on the actions taken by that nation under the negotiated agreement with the President. On the facts found by the trial court in this case, the Secretary's determination did not violate the standard.
 
 CONCLUSION
 
 77
 The judgment of the Court of International Trade is
 
 
 78
 AFFIRMED.
 
 COSTS
 
 79
 No costs.
 
 
 80
 RADER, Circuit Judge, concurs in the result.
 
 
 
 Notes:
 
 
 *
 Judge Plager assumed senior status on November 30, 2000.
 
 
 [1]
 Large-scale driftnet fishing by United States nationals and vessels, both within the United States EEZ and on the high seas, is prohibited by 16 U.S.C. §1857(1)(M), the Magnuson Fishery Conservation and Management Act.