ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| L3 Technologies, Inc. | ) | ASBCA Nos. 61811, 61813, 61814 |
| | ) | |
| Under Contract Nos. FA8620-06-G-4002 *et al.* | ) | |

APPEARANCES FOR THE APPELLANT: Karen L. Manos, Esq.
　　　　　　　　　　　　　　　　　　Erin N. Rankin, Esq.
　　　　　　　　　　　　　　　　　　Justin P. Accomando, Esq.
　　　　　　　　　　　　　　　　　　　Gibson, Dunn & Crutcher LLP
　　　　　　　　　　　　　　　　　　　Washington, DC

APPEARANCES FOR THE GOVERNMENT: Arthur M. Taylor, Esq.
　　　　　　　　　　　　　　　　　　　DCMA Chief Trial Attorney
　　　　　　　　　　　　　　　　　　Amelia R. Lister-Sobotkin, Esq.
　　　　　　　　　　　　　　　　　　　Trial Attorney
　　　　　　　　　　　　　　　　　　　Defense Contract Management Agency
　　　　　　　　　　　　　　　　　　　Chantilly, VA

MAJORITY[1] OPINION BY ADMINISTRATIVE JUDGE PROUTY

　　　These three appeals, submitted by appellant, L3 Technologies, Inc. (L3), involve government claims challenging both indirect and direct costs paid to L3 on several government contracts for certain years. As the litigation progressed, the government apparently thought better of its claims and withdrew them *in toto* and represented it would make no further claims on the contract years in question. Consequently, the government has moved for dismissal of these appeals on mootness grounds. L3 opposes, seeking either summary judgment in its favor or that we deny the motion to dismiss and keep the appeals live so that it can obtain a victory that, it believes, would preclude its suffering similar government claims in other contract years. On the facts before us, we grant the government's motion and dismiss these appeals as moot. L3's motion for summary judgment is denied.

---

[1] These appeals were originally considered by a five-judge division of the Board, including Judge Kinner, who passed away while the matter was still under deliberation. Because three of the remaining four judges concurred in this opinion, there was no need to appoint a fifth judge to the division. Under the Board's internal rules, this decision is precedential.

For the purposes of deciding the motions before us, we need not delve too deeply into the merits of the underlying appeals, but need to understand their scope and the limits of what they may accomplish.

I. What the Appeals are About

The first of these appeals, No. 61811, challenges a Contracting Officer's Final Decision (COFD) dated June 28, 2018, seeking repayment of $10,692,605 by L3 for certain "other direct costs" and overhead that had been included in L3's final indirect cost rate proposals[2] for the fiscal years 2011, 2012, 2013, and 2014. *See* compl. ¶ 8.[3] The COFD followed a group of audit reports (one for each contract year)[4] by the Defense Contract Audit Agency (DCAA), all issued on September 27, 2017, questioning $14,337,524 of these already-paid costs (*id.* ¶ 9). These audit reports all utilized some degree of statistical sampling of particular costs (*e.g.*, individual instances of premium air travel that the auditor felt were not justified), with results extrapolated across the board for that cost (*id.* ¶¶ 12, 15, 20, 22; app. opp'n at 7-8, 10-11[5]).

Appeal No. 61813 is an appeal of a far more modest government claim. There, the June 29, 2018 COFD demanded the payment of $6,002 based upon a February 14, 2018 DCAA audit report that questioned the use of premium airfare for two L3 employees for the years 2012-2015 (*see* R4, tab 4 at G000274, G000344-49).

And Appeal No. 61814 is another, even smaller, government claim, resting upon a different COFD, though also issued on June 29, 2018, seeking $2,542 in premium airfare incurred by an L3 employee in 2011. It rested upon the same February 14, 2018 DCAA audit report that informed the COFD in Appeal No. 61813 (*see* R4, tab 4 at G000274, G000352-58).

---

[2] For an explanation of how indirect cost rate proposals work, we refer the reader to *Tech. Sys., Inc.*, ASBCA No. 59577, 17-1 BCA ¶ 36,631.

[3] The only appeal for which a complaint was submitted (and it was submitted by the government) is Appeal No. 61811.

[4] These were numbered 9511-2011G10100001, 9511-2012G10100001, 9511-2013G10100001, and 9511-2014G10100002 (compl. ¶ 9).

[5] With the exception of its objection to certain language it deemed inflammatory and some characterizations of the evidence, the government agrees with the facts presented in L3's brief in opposition to its motion to dismiss. *See* gov't reply at 2-3. Thus, much of the procedural history that we set forth here comes from L3's brief since both parties agree that it is accurate.

II. The Present Litigation and the Government's Unequivocal Withdrawal of its COFDs

These three appeals (all submitted to the Board the same day) were immediately consolidated. L3 then requested that the Board order the government to file the complaint in Appeal No. 61811, which we directed and the government accomplished.[6] The government's complaint in Appeal No. 61811 seeks no declaratory or injunctive relief, but merely explains the basis of its claim and demands payment consistent with the COFD for the years covered by it. *See* compl. Discovery followed.

Ultimately, as admitted in a February 28, 2020 email from government counsel to L3's attorney, the government decided that it could not defend these appeals. *See* app. opp'n, ex. 2. Thus, in a letter to L3's Chief Financial Officer dated February 28, 2020, the cognizant administrative contracting officer wrote:

> I hereby unequivocally withdraw the Contracting Officer's Final Decisions ("COFDs") and demands for payment dated 28 June 2018 (ASBCA No. 61811), signed by Gladys Broyles, 29 June 2018 (ASBCA No. 60813) signed by Cheryl L. Clark, and 29 June 2018 (ASBCA No. 60814), signed by Jennings L. Summers that have been appealed to the ASBCA and assigned the respective docket numbers. A motion for dismissal of those appeals will be filed by the assigned trial attorney. The Government does not intend to re-assert the costs at issue in those disputes.

(Gov't mot., ex. 1) L3 makes no assertion that these COFDs may be re-imposed nor that the government will re-assert its challenge to the costs at issue in those disputes. We find, as a matter of fact, that the withdrawal of these claims is unequivocal.

III. Other Litigation Involving L3's Contracts and DCAA Audits

As we will explain more below (and as noted in Judge Clarke's dissent), L3 opposes the government's request to dismiss these appeals because it contends it has been here before. Many times. And without resolution. The dissenting opinion discusses this at length and, although we come to a different conclusion regarding the legal consequences, we agree that L3 has been to the Board quite often in recent years as a consequence of COFDs stemming from incurred cost audits and that none of these

---

[6] The government opposed L3's motion to require it to file a complaint, stating in its November 9, 2018 opposition, *inter alia*, that, L3 "is fully aware of the issues in these appeals . . . . The disallowances are the results of an ongoing dispute that has existed for several years and which is the subject of several other disputes before the Board." *See* app. opp'n at 12.

3

appeals has led to a decision on the merits.[7]  This happened for appeals of audits of years 2006, 2007, 2008, 2009, and 2010.  (App. opp'n at 4-10)  Moreover, some of these prior appeals involved audits which utilized statistical sampling as in the audit that is the basis of Appeal No. 61811.  *See, e.g.*, app. opp'n at 6-7 (referring to the use of decrement for audit of 2009 direct costs).  Appeal Nos. 62123, 62267, and 62268, brought by L3 challenging the disallowance of other incurred costs by the government resting in part on similar statistical extrapolation, remain pending before the Board, but stayed pending the outcome of the present appeals.  (App. opp'n 13-14)

DECISION

As will be discussed below, the government's withdrawal of the COFDs moots these appeals, which are premised upon them since there is simply no additional, legally cognizable relief that this Board can afford L3.  Moreover, neither exception to the mootness doctrine asserted by L3 – voluntary cessation and capable of repetition yet evading review – is applicable here.

I.  The Mootness Doctrine:  Generally, a Case is Moot When an Adjudicatory Body May No Longer Provide Relief.

In the past, we have had no compunction against dismissing, as moot, appeals in cases analogous to this one, where the CO has withdrawn COFDs asserting government claims on incurred costs.  In *Combat Support Associates*, ASBCA Nos. 58945, 58946, 16-1 BCA ¶ 36,288, a case involving incurred cost audits and government claims disallowing costs already paid, we dismissed the appeal on government motion after the government claims were withdrawn, writing:

> Where a contracting officer unequivocally rescinds a government claim and the final decision asserting that claim, with no evidence that the action was taken in bad faith, there is no longer any claim before the Board to adjudicate, and the appeal is dismissed.  *KAMP Systems, Inc.*, ASBCA No. 54253, 09-2 BCA ¶ 34,196 at 168,995.  In such circumstances, the government's voluntary action moots the appeal, *cf. Teddy's Cool Treats*, ASBCA No. 58384, 14-1 BCA ¶ 35,601 at 174,410 (dismissing appeal as moot where government changed default termination to a notice termination), leaving the Board without jurisdiction to entertain the appeal further.

---

[7] In a significant number of these appeals, however, the matters were settled with the consent of L3 and not over its objections.  *See* app. opp'n at 4 (appeal of COFD for 2006 costs settled by parties shortly before hearing), app. opp'n at 5 (appeal of COFDs for 2007 costs settled by parties), app. opp'n at 7 (appeal of COFDs for some 2009 costs settled by parties), app. opp'n at 9-10 (appeal of COFDs for other 2009 costs and 2010 costs settled by parties).

4

> *See Lasmer Indus., Inc.*, ASBCA No. 56411, 10-2 BCA
> ¶ 34,491 at 170,123.

16-1 BCA ¶ 36,288 at 176,974; *see also Advanced Powder Solutions*, ASBCA No. 61818, 19-1 BCA ¶ 37,425, aff'd 831 Fed. Appx. 501 (Fed. Cir. 2020) (dismissing appeal because, without claim, the Board had no jurisdiction).

We ruled similarly in *Quimba Software, Inc.*, ASBCA No. 59197, 19-1 BCA ¶ 37,350, rejecting Quimba's complaints that the government had wrongfully compelled it to expend resources defending against a claim that had no basis, (allegedly) being brought after the expiration of the statute of limitations. *See Quimba Software,* 19-1 BCA at 181,613. Indeed, L3, itself, had a previous set of its appeals of government incurred cost claims dismissed over its objection upon the government's withdrawal of the COFD's in question.[8] *See L-3 Communications Integrated Sys., L.P.*, ASBCA Nos. 60431, 60432, 16-1 BCA ¶ 36,362.

The basis for such mootness dismissals is the constitutional requirement for a case or controversy.[9] "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). As the Federal Circuit summarized in *Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1382 (Fed. Cir. 2014), "[a] case becomes moot when interim relief or events have eradicated the effects of a defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." 764 F.3d at 1391 (citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)); *see also Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 939 (Fed. Cir. 2007) ("When, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should generally be dismissed.").

It should be clear that this "legally cognizable interest" in the outcome is tied not merely to the conduct being challenged by the lawsuit, but the relief or remedy available through continued litigation. The Supreme Court recognized this in *Powell v. McCormack* when discussing one of its earlier opinions holding a matter moot: "[The earlier case] stands . . . for the proposition that, where one claim has become moot and the pleadings are insufficient to determine whether the plaintiff is entitled to another remedy, the action should be dismissed as moot." 395 U.S. at 499. Put another way, even if a litigant remains harmed by the actions of the other party after that party has

---

[8] This was one of the sets of appeals of which L3 complains above.

[9] L3 argues that, to the extent that these decisions rested upon the notion that withdrawal of the COFD's divested the Board of jurisdiction by the fact that there was no longer a COFD to appeal, they were contrary to Board precedent holding that withdrawal of COFDs does not divest the Board of jurisdiction. *See* app. opp'n at 26-30. We rest our opinion here upon the mootness doctrine, which is centered upon the case-or-controversy requirement, not the lack of a COFD to appeal.

changed its behavior to remove the basis of the pending suit, if the court is no longer able to provide a remedy to that remaining harm, the case is moot. As the Supreme Court noted in *Spencer v. Kemna*, a case remains viable only if "throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" 523 U.S. 1, 7 (1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). The implications of this straightforward explanation of the law, it will be seen, are significant.

## II. On Their Faces, These Appeals Are Moot

Simply speaking, the COFDs appealed here no longer exist – they have been withdrawn. Moreover, the government has unequivocally stated that it will never again challenge the incurred price proposals for the contract years at issue. Therefore, seemingly, there is no relief we may grant and the appeals should be dismissed. This is very much like the circumstances we saw in *Combat Support Associates*, *Quimba*, and the previous 2016 *L3* decision. Thus, if there weren't more to it, we could comfortably grant the government's motion based upon our precedent.

## III. The Voluntary Cessation Doctrine Is Inapplicable Here Because The Harm Being Appealed Is Unlikely To Recur

But there is somewhat more to it: L3 argues that the two exceptions to the mootness doctrine preclude dismissal. The first of these, "voluntary cessation," is where L3 makes its primary argument. *See* app. opp'n at 21-32. L3 quotes the Supreme Court as holding that, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.' '[I]f it did, the courts would be compelled to leave "[t]he defendant … free to return to his old ways.'" (App. opp'n at 18; citing to *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (internal citations omitted) However, as L3 rightly concedes, it is not that voluntary cessation could *never* support a dismissal for mootness, just that the party seeking dismissal must also demonstrate that the objected to actions will not recur. Hence, in *County of Los Angeles,* the Supreme Court explained that the voluntary cessation doctrine would not apply if: "it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" 440 U.S. at 631 (citations omitted); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (though the burden is "heavy," a case may be dismissed as moot if the defendant can demonstrate that there is "no reasonable expectation that the wrong will be repeated.").

The motion here turns on the question of what "wrong" is at issue. The government argues that the wrong at issue is delimited by the COFDs being appealed: the government's rejection of cost submissions for particular contract years, which the government asserts it will never again reject. No argument is made by L3 that these will

6

ever return. If the government is correct (and it is), the voluntary cessation doctrine does not apply because there is no reasonable expectation that the wrong will be repeated.

L3 appears to see the wrong(s) that may be repeated as the government's challenges to L3's corporate travel policy and its use of its statistical means of challenging its incurred cost submissions. *See, e.g.,* app. opp'n at 20. If those were the wrongs that these appeals could legally eliminate, we would agree that the voluntary cessation doctrine might require our denial of the government's motion. They aren't.

These appeals do NOT seek a declaratory judgment or injunctive relief finding L3's corporate travel policy appropriate or preventing the statistical sampling methodology which L3 finds so objectionable.[10] Thus, if we refused to dismiss the appeals, and if L3 were to obtain a complete legal victory on the merits, the remedy that L3 would obtain would be no more than it is already getting by the withdrawal of the COFDs: it would no longer be obliged to repay the government the costs set forth in the three withdrawn COFDs. L3 and the dissent appear to be laboring under the mistaken notion that winning on the merits here would, *per se*, decide the propriety of L3's travel policies once and for all and prevent the future use of DCAA's statistical sampling and extrapolation methodologies in other audits, but there is no basis for such a belief. After all, entitlement to a decision on an appeal is not the same thing as entitlement to binding precedent, generalized beyond the years of a particular dispute, upon the issues of interest to a particular party.[11] To be sure, a victory on the merits would be satisfying to L3 and present a rhetorical cudgel to use against DCAA in the future – perhaps even to persuasive effect – but the only thing certain that it would do for L3 would be to provide relief for the years at issue and that is already being given.[12] That is why we have placed so much emphasis on the "legally cognizable relief" part of the mootness definitions, for it defines the arena in which the mootness analysis and, necessarily, its exceptions apply. The 10th Circuit Court of Appeals came to a similar conclusion in *Chihuahuan Grasslands Alliance v. Kempthorne*, 545 F.3d 884 (10th Cir. 2008), a case in which the plaintiffs fought a motion to dismiss on mootness grounds by arguing that the court was presented with a case of both voluntary cessation, and

---

[10] Given the fact that, at L3's demand, the government filed the complaint here, this is hardly surprising. But even if L3 had filed the complaint, itself, we are not so certain that its appeal of the government's claims would have entitled it to seek such relief – a matter which we need not address as it remains hypothetical, just as the possibility of a claim seeking a contractual interpretation finding L3's travel policies to be appropriate or barring the use of DCAA's statistical modeling would be.

[11] To state the obvious, the law provides a way for a litigant to get that binding precedent: declaratory or injunctive relief. If a party wants it, it must explicitly seek it, rather than hoping to obtain it as an incidental consequence of its monetary claims.

[12] Moreover, if "case or controversy" has any meaning at all, merely symbolic wins, with no formal legal consequence, no matter how helpful to a party, are not what courts are for. *See, e.g., Massachusetts v. E.P.A.*, 549 U.S. 497, 547 (2007) (Roberts, CJ, dissenting).

"capable of repetition yet evading review" (which we address below). The Court of Appeals held that, for purposes of mootness determination, it was proper to "rely on the claims and requests for relief in the Complaint" and not the broader issues that the plaintiffs later wished to address. 545 F.3d at 892-93. Such are the circumstances here.

IV. <u>The Dismissed Appeals Are Not an Injury Capable of Repetition, Yet Evading Review</u>

If the voluntary cessation doctrine may be thought of as preventing one of the interested parties from pulling the rug out from under the other, "capable of repetition, yet evading review" is the circumstance where the very nature of the alleged wrong precludes judicial review because its duration is too short, but the controversy is expected to return. It was first enunciated in *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498 (1911), and has been part of jurisprudence ever since, recently discussed in a procurement context by the Supreme Court in *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969 (2016). As summed up in *Kingdomware*:

> [T]his Court's precedents recognize an exception to the mootness doctrine for a controversy that is "'capable of repetition, yet evading review.'" *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998). That exception applies "only in exceptional situations," where (1) "the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration," and (2) "there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Ibid.* (internal quotation marks omitted; brackets in original).

136 S. Ct. 1976. But this is not the kind of case for which this exception applies. First, nominally, there would be ample time for the matter to be reviewed by the Board or the Court of Federal Clams. Cost allowability determinations, like the ones at issue here, are not the type of actions that end after a given period time; rather, they have no expiration date and are simply about who is entitled to a certain amount of money.

Moreover, L3 obtained its full remedy: full review was, in fact, available and the only reason that a judicial decision wasn't issued was because it was not necessary.

To the extent that L3 attempts to argue that the government's actions are what made the duration too short to afford review (*see* app. opp'n at 32-33), thus placing this matter into the capable of repetition yet evading review rubric, it has made the logical fallacy known as a category error. For under this approach, all instances of voluntary cessation would fall within the capable of repetition yet evading review classification and there would be no point in the separate analysis. It is more consistent with the legal paradigm of mootness exceptions to review the government's actions here under the voluntary cessation umbrella. Moreover, as discussed above, the unavailability of a

8

legally cognizable remedy deprives us of a case or controversy, leaving no basis to apply the second exception, even if it were otherwise proper to do so.

## CONCLUSION

Because these appeals are moot, they are dismissed. This action makes L3's motion for summary judgment, itself, moot, since we no longer possess jurisdiction over these appeals, and we deny it as such.

Dated: March 1, 2021

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

ELIZABETH WITWER
Administrative Judge
Armed Services Board
of Contract Appeals

I dissent (see separate opinion)

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

9

DISSENTING OPINION BY ADMINISTRATIVE JUDGE CLARKE

I respectfully dissent because I believe the mootness exception applies. The majority decision subjects L3 (and other contractors) to the unfortunate chain of events discussed below until DCAA and DCMA resolve whatever their differences are. I wrote the original decision with which my colleagues disagree. I have attached my original decision as my dissent.[13]

In these appeals of government claims, the contracting officer unequivocally withdrew the supporting final decisions stating the claims would not be asserted again rendering the appeals moot. I find that the final decisions are moot. For the first time, the Board should allow a moot case to proceed based on the exception to mootness doctrine. After resolving the mootness matter, I interpret FAR 31.201-3, Determining reasonableness, to properly allocate the burden of proof. Finally, I would deny L3's motion, which I deem to be a motion for summary judgment, because of material disputed facts concerning allowability of L3's costs. The Board has jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-9.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

*Relevant FAR Clauses*

1. Two FAR clauses[14] play an important role in the Defense Contract Audit Agency (DCAA) Audits:

> FAR 31.201-2, Determining allowability.
>
> (a) A cost is allowable only when the cost complies with all of the following requirements:
>
> (1) Reasonableness.
>
> (2) Allocability.
>
> (3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances.
>
> (4) Terms of the contract.

---

[13] I attempted to resolve the change from "we" to "I" in adapting my decision to a dissent but may not have been totally successful.

[14] I do not list FAR 31.201-4, Allocability, because there is no disagreement over the fact these costs are allocable to L3's contracts.

(5) Any limitations set forth in this subpart.

And:

FAR 31.201-3, Determining reasonableness.

(a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints. No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.

(b) What is reasonable depends upon a variety of considerations and circumstances, including-

(1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

(2) Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;

(3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

(4) Any significant deviations from the contractor's established practices.

*DCAA Audit Methodology*[15]

2. The method DCAA uses to conduct its audits depends on the volume of cost data. In a few situations the volume of cost data may be small enough that DCAA can

---

[15] I readily admit that the audit reports, expert reports and briefs do not afford a complete understanding of DCAA's procedures to include Dollar Unit Sampling (DUS),

conduct a 100% audit. In most situations the data is voluminous making 100% audit impossible. In these situations DCAA must use statistical analysis to perform its audits and reach its conclusions. DCAA has an in-house developed statistical tool called "EZ-Quant" that it uses to select a sample based on DCAA's size criteria and then conducts a 100% audit of the sample to determine the questioned costs in the sample. DCAA then "extrapolates" the questioned costs in the sample to the remaining costs to arrive at its conclusions on total unallowable costs (app. opp'n at 10-11, 15-16, 24)[16]. At times DCAA will question the accuracy EZ-Quant results and resort to a sample based on auditor judgmental selection (app. opp'n at 11). DCAA discusses its methodology in its opposition, here is an example:

> DCAA auditor Cynitra Kennard, under the supervision of Mr. North, audited L3's shelter differential costs for 2011-2014, and selected a sample of transactions using EZ-Quant. Ms. Kennard testified that she used EZ-Quant again to audit shelter differential costs for 2015-2016. Kennard Dep. at 28:12-18. The 2015-2016 audit report confirms that DCAA used statistical sampling methodology to select a sample and extrapolate questioned costs. Ex. 25 at 55. For 2017, Ms. Kennard likewise used EZ-Quant and statistical sampling to extrapolate questioned costs for L3's off-site living allowances. *Id*. at 26:20-22; Ex. 26 at 43-44. Ms. Kennard also testified that she used EZ-Quant to select the sample transactions from the shelter differential account for the 2018 ICP audit, which is ongoing. Kennard Dep. at 26:3-17.

(App. opp'n at 16)

*The DCAA Audits*

3. These claims were audited by DCAA resulting in Audit Reports for L3's Mission Integration Division (MID), dated September 27, 2017, and Platform Integration Division (PID), dated February 14, 2018. The audit report for MID are 9511-2011G10100001, 9511-2012G10100001, 9511-2013G10100001 and 9511-2014G10100002 for L3's fiscal years 2011 to 2014 (R4, tab 2). The audit report for PID are 9511-2011W10100001, 9511-2012W10100001, 9511-2013W10100001 for L3's fiscal years 2011 to 2013 (R4, tab 3).

4. In the audit reports for MID, DCAA questioned the following costs:

---

Physical Unit Sampling (PUS), and judgmental selection, but I have sufficient detail required for our decision.

[16] I rely on L3's Statement of Facts because DCMA generally agrees with L3's facts except for certain characterizations (gov't resp. at 2-3).

- $56,285 of the contractor's claimed CFY 2011-2014 Indirect Labor costs.

- $5,539,395 of the contractor's claimed CFY 2011-2014 Outside Services costs.

- $4,359,465 of the contractor's claimed CFY 2011-2014 Employee Relocation costs.

- $67,153 of the contractor's claimed CFY 2011-2014 Settlement to Cost Center costs.

- $178,270 of the contractor's claimed CFY 2011-2014 Indirect Travel Airfare costs.

- $137,975 of the contractor's claimed CFY 2011 L3 Corporate Allocation costs.

- $288,719 of CFY 2014 Corporate Home Office Allocation costs.

- $791,170 of the contractor's claimed CFY 2011 Home Office Allocation costs.

- $14,337,524 of the contractor's claimed Direct Costs. Exhibit C identifies the questioned amounts by account.

(R4, tab 2 at 4) DCAA provided additional detail in Exhibit A (Indirect costs), Schedule A-07 (R4, tab 2 at 20-45), and Exhibit C (Direct costs), Schedule C-05 (R4, tab 2 at 80-100). At the end of the audit DCAA offered to provide more information, "Due to the voluminous nature of the calculations related to these questioned costs, additional information will be provided upon request" (R4, tab 2 at 100).

5. In the audit reports for PID, DCAA questioned the following costs:

- $297,177 ($267,113 + $30,064) of the contractor's claimed CFYs 20112013 Indirect Travel – Airfare costs.

- $128,246 of the contractor's claimed CFYs 2011-2013 Bonus Costs which are included in the claimed Fringe Expenses.

- $37,511 of the contractor's claimed CFY 2011 Workers Compensation Fringe Costs.

- $82,429 of the contractor's claimed Direct Costs.

13

(R4, tab 3 at 6)  DCAA provided supporting detail in Exhibit A, indirect costs 2011-2013 (*id.* at 12); Schedule A-01, air travel and marketing, G&A and engineering for 2011 (*id.* at 16-18); Schedule A-02, engineering air travel for 2011 (*id.* at 21); Schedule A-03, fringe for 2011 (*id.* at 22-25); Schedule A-04, G&A air travel for 2012 (*id.* at 26); Schedule A-05, engineering air travel for 2012 (*id.* at 27); Schedule A-06, fringe for 2012 (*id.* at 28); Schedule A-07, G&A air travel for 2013 (*id.* at 29); Schedule A-08, engineering airfare for 2013 (*id.* at 30); Schedule A-09, fringe air travel for 2013 (*id.* at 31); Exhibit B, penalties for 2011 to 2013 (*id.* at 32-44); and Exhibit C, direct costs air travel for 2011 to 2013 (*id.* at 45-47).

*DCMA Contracting Officer Final Decisions*[17]

6.  According to the Board's docketing notice (R4, tab 4 at 1) the following ASBCA Nos. are associated with the following government claims:

| ASBCA No. | Claim |
|---|---|
| 61810 | Government claim for $347,915 |
| 61811 | Government claim for $10,692,605 |
| 61812 | Government claim for $572,318 |
| 61813 | Government claim for $6,002 |
| 61814 | Government claim for $2,542 |

ASBCA No. 61810 was settled and dismissed with prejudice.  ASBCA No. 61812 was dismissed without prejudice for lack of jurisdiction leaving ASBCA Nos. 61811, 61813 and 61814 active in this appeal.

7.  On June 28, 2018, Ms. Gladys Broyles, Defense Contract Management Agency (DCMA) Administrative Contracting Officer (ACO), issued a Contracting Officer's Final Decision (COFD) demanding payment of $10,692,605 based on DCAA Audit Report Nos. 9511-2011G10100001, 9511-2012G10100001, 9511-2013G10100001, 9511-2014G10100002, dated September 27, 2017 (R4, tab 4 at 28).  Based on the docketing notice this COFD relates to ASBCA No. 61811.  ACO Broyles broke down her decision into six unallowable direct cost amounts:

| | |
|---|---|
| ODC Travel Air | $1,335,924 |
| ODC Hotel | $443,368 |
| ODC Meals | $210,771 |
| ODC Shelter Differential | $7,602,056 |
| ODC Other | $1,100,486 |
| G&A | $1,722,601 |

---

[17] At this point it is difficult, but also unnecessary, to trace the dollar amounts in the audits directly to the amounts in the final decisions.

14

(R4, tab 4 at 30-31) ACO Broyles provided the rational for her finding in six notes associated with each of the six amounts disallowed (*id.* at 31-40). ACO Broyles repeatedly relied on FAR 31.201-3(a) to place the burden to prove challenged costs are reasonable on L3 (*id.* at 31-38).

8. On June 29, 2018, ACO Cheryl Clark issued a COFD demanding payment of $6,002 based on DCAA Audit Report No. 9511-2011W10100001 (R4, tab 4 at 71). Based on the docketing notice this COFD relates to ASBCA No. 61813. ACO Clark explained the $6,002 as follows, "This pertains to contract number FA8620-10-G-3023-1118 regarding the travel expenses of Frank Franklin and Mark Cross from January 1, 2012 to January 12, 2015 outlined in document numbers 19003022785 and 1900303999" (*id.*). ACO Clark further explained, "Under FAR 31.201-3(a) if the contracting officer challenges the specific costs . . . 'the burden of proof shall be upon the contractor to establish that such cost is reasonable.' As a result, in order to establish reasonableness, L3 PIO has the burden of justifying the need for premium airfare under FAR 3 l-205-46(b) to include FAR 3 l.205(46)(a)(7)" (*id.* at 73).

9. On June 29, 2018, ACO Jennings L. Summers issued a COFD demanding payment of $2,542 based on DCAA Audit Report No. 9511-2011W10100001 (R4, tab 4 at 79). Based on the docketing notice this COFD relates to ASBCA No. 61814. ACO Summers explained that the disallowed amount related to air travel by Mr. Bays. ACO Summers further explained, "Given the above, under FAR 31.201-3(a), I cannot find that a reasonably prudent person would incur the cost of business class airfare for air travel of three hours. The return coach airfare trip supports my position. As a result, under 31.201-3(a) the burden of proof is on L3 to establish reasonableness fell to L3" (*Id.* at 81).

*L3 Appeals*

10. L3 appealed the COFDs to the Board (app. opp'n at 11 ¶ 22).

*DCMA Withdraws the COFDs and Moves for Dismissal*

11. On February 28, 2020 DCMA ACO Charles A. McGlothen withdrew the COFDs:

> I hereby unequivocally withdraw the Contracting Officer's Final Decisions ("COFDs") and demands for payment dated 28 June 2018 (ASBCA No. 61811), signed by Gladys Broyles, 29 June 2018 (ASBCA No.60813) signed by Cheryl L. Clark, and 29 June 2018 (ASBCA No.60814), signed by Jennings L. Summers that have been appealed to the ASBCA and assigned the respective docket numbers. A motion for dismissal of those appeals will be filed by the assigned trial attorney. The Government does not intend to re-assert the costs at issue in those disputes.

15

(Gov't mot., ex. 1)  DCMA filed a Motion to Dismiss on the same day, February 28, 2020 (gov't mot.).

*Other Audit Disputes*

12.  In its opposition to DCMA's motion to dismiss, L3 summarizes similar audit disputes between L3 and DCAA/DCMA from 2006 through 2018.  These disputes all followed a similar path:  DCAA conducts Audits challenging costs, DCMA issues COFDs implementing the DCAA Audits and demanding repayment of the challenged costs, L3 appeals the COFDs to the Board and DCMA either withdraws the COFDs or the parties settle for a nuisance amount resulting in dismissal of the appeals with prejudice (app. opp'n ¶¶ 3-5 (2006), 6-8 (2007), 9-12 (2008), 13-15 (2009) and 16-19 (2010).  The disputes involved in this decision followed a similar path but remain unresolved (app. opp'n ¶¶ 20-22 (CYs 2011 to 2014)).  There are several similar appeals that have been stayed pending resolution of the appeals in ASBCA Nos. 61811, 61813 and 61814 (app. opp'n ¶¶ 27-28, 33 (CYs 2011 to 2016)).

13.  In its opposition, L3 makes the point that this cycle of DCAA Audit using statistical analysis and extrapolation, DCMA COFDs, appeal and withdrawal of the COFDs is seen from 1006 through 2018:

> As described above, DCMA ACOs have issued COFDs disallowing L3's airfare costs year after year since 2006 and then subsequently withdrew the claims or settled for nuisance amounts.  This dispute has continued with DCAA's 2015-2016 and 2017 audit reports.

(App. opp'n at 16)  And:

> However, it is clear that DCAA continues to question the same types of costs for the same reasons, and DCAA also continues to use the same purported statistical sampling methods.

(App. opp'n at 15)  And:

> During those depositions, several of the auditors who were involved in subsequent audits of ICPs (*i.e.*, the 2015, 2016, 2017, and 2018 ICPs) admitted that DCAA employed statistical sampling to extrapolate and question costs in those subsequent audits.

(App. opp'n at 15)  And:

16

As of the date of this filing, DCMA has not issued a COFD sustaining the costs questioned in those reports.  However, it is clear that DCAA continues to question the same types of costs for the same reasons, and DCAA also continues to use the same purported statistical sampling methods.

(App. opp'n at 15)

*Expert Witnesses*

14.  Each party employed an expert and submitted an expert report.  Neither party objected to the expert status of the other party's expert, therefore, I find both witnesses qualify as experts in statistical analysis.

15.  L3's expert is Mr. Lynford Graham.  In his expert report Mr. Graham explains that he was hired by L3 "to comment on the applications of statistical sampling in the Defense Contract Audit Agency (DCAA) claims of questioned costs as stated in the 2 audit reports at issue in the appeals of L3 Technologies, Inc. (L3), ASBCA Nos. 61810, 61811, 61813, 61814" (app. opp'n, ex. 22 at 4-5).  Mr. Graham concludes that DCAA's methods using Dollar Unit Sampling (DUS), Physical Unit Sampling (PUS), DCAA's sample size selection, and DCAA's "EZ-Quant" software used by the DCAA to apply statistical techniques all result in unreliable results (*id.* at 5-6).  Specifically, DCAA's methods and software used "for the purpose of estimating questioned costs are not supportable" (*id.* at 6).  Attached to Mr. Graham's report is Appendix A:  Summary of Sampling Applications in L3 Technology Audits (*id.* at 46).  The table indicates that sampling was used for six out of eight costs.  By way of explanation I look at employee relocation costs.  According to the table, DUS sampling was used on a "population" of $7,822,914 using a sample of 89 resulting in disallowing $4,359,456[18] (*id.*).

16.  DCMA's expert is Mr. Ali Arab.[19]  In his rebuttal report Mr. Arab starts out by distinguishing DCAA audits, "The audits performed by DCAA are significantly different than financial audits.  The purpose of an incurred cost audit (the subject of the L3 ASBCA cases) is to provide an opinion on the contractor's certified assertion that the incurred cost submission does not contain unallowable costs" (app. opp'n, ex. 23 at 6).  He further explained:

My report is focused on DCAA's sampling program as used in the L3 audits.  It is important to note that DCAA questioned a total of $26.2 million; of which $5.6 million (21.4 percent) was based on statistical sampling projections.

---

[18] The table is not completely self-explanatory and the numbers may be a little off because the table is a bit illegible but it serves its purpose for this decision.

[19] DCMA produced Mr. Arab's expert rebuttal report but expressed its intention not enter it into evidence (gov't resp. at 22).

17

The remaining $20.6 million is based on methods outside of the use of statistical sampling.

(*Id.* at 7)  Mr. Arab found that the sample sizes used by DCAA were based on 80% not 90% confidence level and were therefore smaller than DCAA desired.  DCAA's use of DUS sample size planning procedure also contributed to a small sample size (*id.* at 8).  He explained that when DCAA used statistical samples to calculate questioned costs, the DCAA audit reports present the point estimate as the most likely amount of the true questioned costs in the audit universe under review (*id.* at 11-12).  Mr. Arab conducted an in-depth review of EZ-Quant and did not identify any issues or concerns (*id.* at 15).

17.  Mr. Arab explained that Audit Report No. 09511-2011G10100001, dated September 27, 2017, used statistical sampling for 21.8 percent of the total questioned costs while the remaining questioned costs were from reviewing individual transitions using judgmental selection (*id.* at 15-16).  None of the questioned costs in Audit Report No. 09511-2011W10100001, dated February 14, 2018, resulted from projections of statistical samples.  All costs questioned were from review of each transaction using judgmental selection.  (*Id.* at 16)  Mr. Arab also attached a table at the end of his expert report presenting DCAA's methods of arriving at its questioned coasts (*id.* at 22).

*DCAA TOP Note*

18.  On January 17, 2020, DCAA, apparently relying on Mr. Arab's findings, issued a "TOP Note" that changed the sample size for Dollar Unit Sampling:

> Dollar Unit Sampling (DUS):  DCAA's sampling program is intended to use a two-sided limit at the 90 percent confidence level.  However, our evaluation determined that the AICP A Table we have used to determine minimum sample sizes is 'based on a one-sided confidence limit.  Consequently, the sample sizes correspond to a two-sided limit at the 80 percent confidence level; not the two-sided limit at the 90 percent confidence level we had instructed.
>
> Using a lower confidence level results in sample sizes that are smaller than desired which impacts the confidence we have in the point estimate.  As a result, our sample sizes will increase.  To address this issue, when performing a DUS sample, please use the chart below to determine minimum sample sizes.  (Chart omitted).

(App. opp'n, ex. 24 at 2)  DCAA also changed the sample size for Physical Unit Sampling:

18

Physical Unit Sampling (PUS):  Prior to this Top Note, DCAA used the DUS sample size planning procedure for a physical unit sample.  We determined this methodology is not justifiable as the underlying theory for these two methods are quite different.  Consequently, the sample sizes determined for PUS using this approach may potentially be smaller than required for a statistically valid sample.  To address this issue, when performing a PUS sample, please use the EZ Quant sample sizer to determine the appropriate sample size.  The Table is no longer valid for PUS.  Enclosure 1 provides details on how to use the EZ Quant Sample Sizer.

(*Id.* at 3)

## DECISION

*Procedural Background*

After L3 appealed DCMA's COFDs (SOF ¶ 10), ACO Charles A. McGlothen issued a February 28, 2020 letter "unequivocally" withdrawing COFDs for Appeal Nos. 61811, 61813 and 61814.  The ACO stated, "The Government does not intend to re-assert the costs at issue in those disputes" (SOF ¶ 11).  Also on February 28, 2020, DCMA filed with the Board a Motion to Dismiss ASBCA Nos. 61811, 61813 and 61814 as moot (*id.*).

Rather than accepting dismissal, L3 chose to fight.  On March 4, 2020 L3 filed its Opposition to Government's Motion to Dismiss and Cross-Motion for a Decision Sustaining the Appeals (app. opp'n).  On April 16, 2020 DCMA filed its Response to Appellant's Opposition and Cross-Motion arguing that the appeals were moot (gov't resp.).  On May 18, 2020, L3 filed its Reply in Support of its Opposition to the Government's Motion to Dismiss and Cross-Motion for a Decision Sustaining the Appeals (app. reply).  I view L3's Cross-Motion for a Decision Sustaining the Appeals as a Motion for Summary Judgment.

The details of above procedural posture is a little confusing.  However, the "big picture" is that first I must decide if the appeals are moot and if so, does the mootness exception apply?  If the exception applies, I address L3'cross motion that I deem a Motion for Summary Judgment.  As explained below, I find the appeals are moot but the mootness exception applies and I deny L3's motion.  Therefore, L3 may continue to pursue its appeals and (1) challenge DCAA's statistical audit procedures and extrapolation of costs found to be unallowable and (2) prove the reasonableness of the alleged unallowable costs.

19

DCMA believes that the appeals should be dismissed as moot based on the unequivocal withdrawal of the final decisions and promise not to reassert the claims (gov't mot. at 1). DCMA opposes L3's argument that the appeal remains "live" because there is no possibility that DCMA will reassert the claim (gov't resp. at 2, 4, 15, 20, 23).

L3 sums up what it wants as follows:

> More importantly, the appeals are not moot because the issues presented in the appeals remain live: L3 seeks a decision on the merits to resolve the issues presented in these appeals— the continuing dispute over the correct interpretation of various FAR sections related to L3's incurred costs and DCAA's use of purported "statistical" sampling to extrapolate questioned costs—which remain live despite the withdrawal of the COFDs.

(App. opp'n at 24) L3 argues that DCAA's statistical sampling and "extrapolation" of questioned costs is flawed. L3 argues, "EZ-Quant is DCAA's fundamentally flawed statistical sampling software application" (app. opp'n. at 16).

Next L3 raises the issue of the correct interpretation of various FAR sections related to L3's incurred costs. Central to L3's position is the allocation of burden of proof. L3 contends that since these are government claims, DCMA has the burden of proof. L3 reasons that since DCMA abandoned its claims, L3 is entitled to judgment on the merits due to DCMA's failure to prove its case.

*ASBCA Nos. 61811, 61813 and 61814 are Moot*

The Board has many decisions dismissing appeals as moot. One of the latest is *Quimba Software, Inc.*, ASBCA No. 59197, 19-1 BCA ¶ 37350:

> In seeking dismissal of the appeal on the ground of mootness, the government argues that the ACO granted all the relief that Quimba sought by voluntarily rescinding the demand for repayment of indirect costs paid through provisional billing rates and stating that it does not intend to issue another decision disallowing the same costs (gov't mot. at 3-5; *see* statement 7).

> Quimba opposes the dismissal. Quimba's main argument is that, while the final audit report was issued in 2008, the government waited until December 2013, after expiration of

the Contract Disputes Act statute of limitations, 41 U.S.C. §7103(a)(4)(A), to issue the final decision.

. . . .

We reject Quimba's argument and dismiss the appeal as moot.

(*Id.* at 181,613)  In *Beechcraft Defense Co.*, ASBCA No. 61550, 18-1 BCA ¶ 37,069 we wrote:

> Where a contracting officer unequivocally rescinds a final decision asserting a government claim, there is no longer any claim before the Board to adjudicate, and the Board has dismissed the appeal as moot.  *URS Federal Support Services, Inc.*, ASBCA No. 60364, 17-1 BCA ¶36,587 at 178,204; *Combat Support Associates*, ASBCA Nos. 58945, 58946, 16-1 BCA ¶36,288 at 176,973.  Accordingly, the appeal is dismissed as moot.

(*Id.* at 180,431)  I find that DCMA's February 28, 2020 "unequivocal" withdrawal of COFDs in ASBCA Nos. 61811, 61813 and 61814 and promise not to "re-assert the costs at issue in those disputes" (SOF ¶ 11) renders these appeals moot.

*The Exception to Mootness[20]*

At the risk of stating the obvious, this repetitive cycle of DCAA Audits challenging costs, DCMA COFDs demanding repayment of the challenged costs, L3's ASBCA appeals and DCMA's dismissals without reaching the merits is untenable (SOF ¶¶ 12-13).[21]  The root cause of why DCMA first adopts DCAA's audit results and then abandons the audits after an appeal is filed is unclear.

---

[20] The majority seems to focus on "voluntary cessation" not the mootness exception.

[21] This situation is apparently not limited to L3.  *Quimba Software, Inc.*, ASBCA No. 59197, 19-1 BCA ¶ 37350; *Advanced Powder Solutions, Inc.*, ASBCA No. 61818, 19-1 BCA ¶ 37425; *Northrop Grumman Corp.*, ASBCA No. 61771, 2019 WL 5089236; *Northrop Grumman Corp.*, ASBCA No. 61345, 2019 WL 4908683; *L3 Communications Integrated Systems, L.P.*, ASBCA No. 60431, 16-1 BCA ¶ 36362; *Sygnetics, Inc.*, ASBCA No. 60357, 18-1 BCA ¶ 37160; *Flightsafety International Inc.*, ASBCA No. 60415, 2018 WL 7200012; *Combat Support Associates*, ASBCA No. 58945, 16-1 BCA ¶ 36288; *Beechcraft Defense Co.*, ASBCA No. 61550, 18-1 BCA ¶ 37069;  *York International Corp.-York Navy Systems*, ASBCA No. 60561, 2016 WL 3565932;  *Autonomous Solutions, Inc.*, ASBCA No. 59131, 2014 WL 518988.

I start with the Supreme Court's discussion of the exception to mootness in *Weinstein v. Bradford*, 96 S.Ct. 347 (1975). In *Weinstein v. Bradford* the Supreme Court did not apply the exception to mootness doctrine but did discuss it in the process of reaching its decision:

> In *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), we reviewed in some detail the historical developments of the mootness doctrine in this Court. *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), was the first case to enunciate the "capable of repetition, yet evading review" branch of the law of mootness. There it was held that because of the short duration of the Interstate Commerce Commission order challenged, it was virtually impossible to litigate the validity of the order prior to its expiration. Because of this fact, and the additional fact that the same party would in all probability be subject to the same kind of order in the future, review was allowed even though the order in question had expired by its own terms.
>
> *Sosna* decided that in the absence of a class action, the "capable of repetition, yet evading review" doctrine was limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.

(*Id.* 348-49)

I found no ASBCA decisions applying this exception to mootness, but I did find one decision acknowledging its existence. In *Combat Support Associates*, ASBCA No. 58945, 16-1 BCA ¶ 36288 we stated:

> We disagree with CSA that we are confronted with a dispute that is "capable of repetition, yet evading review." A case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. *Humane Society of the United States* v. *Clinton*, 236 F.3d 1320, 1331 (Fed. Cir. 2001). However, a claim is not moot if that action is capable of repetition, yet evading review. *Id.* To qualify for this exception, the challenged action must meet two conditions. *Id.* First, the action must in its duration be too short to be fully litigated prior to its cessation or expiration. *Id.* Second, there must be a reasonable likelihood

that the party will again suffer the injury that gave rise to the
suit. *Id*.

(*Id.* at 176,974) I conclude from *Combat Support Associates* that there is no impediment to the Board's reliance on the mootness exception in the right circumstances. If there was ever the "right circumstance," this is it.

*DCMA's Position*

DCMA opposes the application of the "exception" to mootness as follows:

> There is no unlawful activity or wrongful behavior. Second, the exception applies when the wrongful behavior is capable of repetition. While it is clear that the Government will continue to determine the allowability of airfare costs in future incurred cost submissions for both L3 and other contractors and may continue to utilize statistical sampling in estimating the amount of those unallowable costs, the Government's future practice will not affect L3's entitlement to the costs originally questioned in the Government claims at issue in these appeals.[22]

(Gov't resp. at 6-7) I disagree with DCMA's inference that the mootness exception requires "unlawful activity or wrongful behavior" or that DCMA's "future practice will not affect L3's entitlement to the costs originally questioned." The cases highlighted below do not involve unlawful activity or wrongful behavior. DCMA's arguments against the mootness exception are unpersuasive.

*Examples Where the Exception Applied*

L3 cited a number of Supreme Court and Federal Circuit cases and I selected three, in addition to *Weinstein v. Bradford* (*Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911)), to help us understand the exception. In *Kingdomware Technologies v. United States*, 136 S.Ct. 1969 (2016) a veteran-owned small business brought a 2012 bid protest claim seeking declaratory and injunctive relief against Department of Veterans Affairs (VA) alleging that the Department failed to comply with the statutory Rule of Two generally requiring the Department to set aside contracts for veteran-owned small businesses. By 2014 the contracts in question had been fully completed and the cases were moot. After reciting the elements of the mootness exception discussed above in *Weinstein v. Bradford* (*Southern Pacific Terminal Co.*), the Supreme Court in *Kingdomware* held the exception applied:

---

[22] This may be true, but every time a contractor must go through this audit, final decision, appeal, dismissal fiasco it must incur litigation costs the government does not reimburse. Settlement is even worse because the contractor is required to pay.

23

Here, no live controversy in the ordinary sense remains because no court is now capable of granting the relief petitioner seeks. When Kingdomware filed this suit four years ago, it sought a permanent injunction and declaratory relief with respect to a particular procurement. The services at issue in that procurement were completed in May 2013. And the two earlier procurements, which Kingdomware had also protested, were complete in September 2012. See decl. of Corydon Ford Heard III ¶¶ 6–8. As a result, no court can enjoin further performance of those services or solicit new bids for the performance of those services. And declaratory relief would have no effect here with respect to the present procurements because the services have already been rendered.

. . . .

That exception applies to these short-term contracts. First, the procurements were fully performed in less than two years after they were awarded. We have previously held that a period of two years is too short to complete judicial review of the lawfulness of the procurement. See *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 514–516, 31 S.Ct. 279, 55 L.Ed. 310 (1911). Second, it is reasonable to expect that the Department will refuse to apply the Rule of Two in a future procurement for the kind of services provided by Kingdomware. If Kingdomware's interpretation of § 8127(d) is correct, then the Department must use restricted competition rather than procure on the open market. And Kingdomware, which has been awarded many previous contracts, has shown a reasonable likelihood that it would be awarded a future contract if its interpretation of § 8127(d) prevails. See decl. of Corydon Ford Heard III ¶¶ 11–15 (explaining that the company continues to bid on similar contracts). Thus, we have jurisdiction because the same legal issue in this case is likely to recur in future controversies between the same parties in circumstances where the period of contract performance is too short to allow full judicial review before performance is complete. Our interpretation of § 8127(d)'s requirements in this case will govern the Department's future contracting

(*Id.* at 1975-76) In *Humane Society v. Clinton*, 236 F.3d 1320 (Fed. Cir.), wildlife and animal protection organizations sued the President and

Secretary of Commerce seeking to compel them to renew action against Italy under High Seas Driftnet Fisheries Enforcement Act. At the time of the Federal Circuit's decision Italy had stopped widespread driftnet fishing and the case was technically moot. However, the Federal circuit held that the exception to mootness applied because a claim is not moot if that action is capable of repetition, yet evading review:

> In a memorandum date-stamped April 28, 1997, concerning "Procedural steps under the High Seas Driftnet Fisheries Enforcement Act," government attorneys recognized that the Driftnet Act did not explicitly address the situation if Italy was to continue or resume large-scale driftnet fishing after the Secretary's certification that driftnet fishing had ceased. The memorandum stated that it was possible to read the Act to require a new identification of Italy under § 1826a(b)(1)(B) and a second round of consultations under § 1826a(b)(2) before the Secretary could prohibit the importation of fish products from Italy. The memorandum also noted that such a process would appear to be incompatible with the purpose of the statute and could result in an annual cycle of agreements that appear to be adequate on paper but prove to be ineffectual in practice.

> We can assume that, if a plaintiff was to challenge the Secretary's certification that a nation had ceased driftnet fishing and brought forth adequate evidence of persistent proscribed driftnet fishing, the Secretary would likely identify that nation again. Because of that re-identification, the challenge to the Secretary's prior certification would almost always be moot under the Government's theory. Thus, the question of the propriety of the Secretary's certification would escape judicial review. Even the Government's attorneys recognized that an ineffectual cycle of repetitious events could occur. We conclude that the purpose of the Act is better effectuated by holding that the question, whether the Secretary's certification that a nation has ceased driftnet fishing is in accord with law, is not rendered moot by a later re-listing or re-identification of that nation.

(*Id.* 1331-32) In *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) a nonprofit ideological advocacy corporation sued Federal Election Commission (FEC), seeking declaration that "electioneering communications" provisions of Bipartisan Campaign Reform Act (BCRA) violated First Amendment. Supreme Court ruled the dispute was not mooted by passing of the election cycle:

25

As the District Court concluded, however, these cases fit comfortably within the established exception to mootness for disputes capable of repetition, yet evading review. (Citations omitted). The exception applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." (Citations omitted). Both circumstances are present here.

As the District Court found, it would be "entirely unreasonable ... to expect that [WRTL] could have obtained complete judicial review of its claims in time for it to air its ads" during the BCRA blackout periods. (Citation omitted) The FEC contends that the 2–year window between elections provides ample time for parties to litigate their rights before each BCRA blackout period. But groups like WRTL cannot predict what issues will be matters of public concern during a future blackout period. In these cases, WRTL had no way of knowing well in advance that it would want to run ads on judicial filibusters during the BCRA blackout period. In any event, despite BCRA's command that the cases be expedited "to the greatest possible extent," § 403(a)(4), 116 Stat. 113, note following (Citation omitted), *two* BCRA blackout periods have come and gone during the pendency of this action. "[A] decision allowing the desired expenditures would be an empty gesture unless it afforded appellants sufficient opportunity prior to the election date to communicate their views effectively." (Citations omitted)

3 The second prong of the "capable of repetition" exception requires a " 'reasonable expectation' " or a " 'demonstrated probability' " that "the same controversy will recur involving the same complaining party." (Citation omitted) Our cases find the same controversy sufficiently likely to recur when a party has a reasonable expectation that it "will again be subjected to the alleged illegality," (citation omitted) or "will be subject to the threat of prosecution" under the challenged law (citations omited). The FEC argues that in order to prove likely recurrence of the same controversy, WRTL must establish that it will run ads in the future sharing all "the characteristics that the district court deemed legally relevant." Brief for Appellant FEC 23.

The FEC asks for too much. We have recognized that the " 'capable of repetition, yet evading review' doctrine, in the context of election cases, is appropriate when there are 'as applied' challenges as well as in the more typical case involving only facial attacks." (Citation omitted) Requiring repetition of every "legally relevant" characteristic of an as-applied challenge—down to the last detail—would effectively overrule this statement by making this exception unavailable for virtually all as-applied challenges. History repeats itself, but not at the level of specificity demanded by the FEC. Here, WRTL credibly claimed that it planned on running " 'materially similar' " future targeted broadcast ads mentioning a candidate within the blackout period, (citation omitted) and there is no reason to believe that the FEC will "refrain from prosecuting violations" of BCRA, (citation omitted). Under the circumstances, particularly where WRTL sought another preliminary injunction based on an ad it planned to run during the 2006 blackout period, (citation omitted) we hold that there exists a reasonable expectation that the same controversy involving the same party will recur. We have jurisdiction to decide these cases.

(*Id.* at 462-64)

Each of these cases apply the elements needed to establish the "capable of repetition, yet evading review" doctrine which are (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 96 S.Ct. 347, 348-349. I studied the Supreme Court's and Federal Circuit's application of the exception to mootness in these four situations. *Southern Pacific Terminal (*cited in *Weinstein v. Bradford*) is the first case in which the Supreme Court applied the mootness exception because of "the short duration of the Interstate Commerce Commission order challenged, it was virtually impossible to litigate the validity of the order prior to its expiration." In *Kingdomware Technologies* it was the short terms of the contracts meaning they were complete before the courts could resolve the case; in *Humane Society* it was the "Secretary's certification that a nation has ceased driftnet fishing"; in *Wisconsin Right to Life* it was the short duration of BCRA [Bipartisan Campaign Reform Act] blackout periods. I want to highlight a significant difference between these cases and L3's situation. In the cases cited above the "short duration" element of the exception was satisfied by something outside the control of government entity arguing that the case was moot and the exception did not apply. Just the opposite in L3's case. It was DCMA that withdrew the final decisions cutting short the appeals. It was DCMA that set up the "capable of repetition, yet evading review" situation. DCMA withdraws the COFDs to moot the appeals and then argues that the exception does not apply. This is unfair and makes for an even more compelling reason

to apply the exception. As the Federal Circuit wrote in *Humane Society*, finding the case moot would lead to an "ineffectual cycle of repetitious events. . . ." The same is true in L3, dismissal of these appeals as moot perpetuates the "ineffectual cycle" already seen between 2006 and 2018 of DCAA audits finding unallowable costs prompting DCMA final decisions demanding repayment, L3 appealing to the ASBCA and ultimately DCMA abandoning the DCAA audits leaving L3 without resolution of its defenses. I conclude from the above that the first element of the mootness exception, "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration" is satisfied.

The record establishes that L3 has endured this cycle of audit, final decision, appeal and dismissal for at least twelve years with no end in sight (SOF ¶¶ 12-13). Therefore, the second element of the mootness exception "a reasonable expectation that the same complaining party would be subjected to the same action again" is satisfied.

*The Mootness Exception Applies in ASBCA Nos. 61811, 61813 and 61814*

I would apply the mootness exception and this case would continue. L3 is entitled to present its arguments to the Board. DCAA/DCMA are likewise entitled to defend the audits. This does not mean that L3 will prevail, it just gives L3 a chance to make its case. I move on to L3's motion for summary judgment.

*Legal Standard for Summary Judgment*

Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citations omitted). In the course of the Board's evaluation of a motion for summary judgment, our role is not "'to weigh the evidence and determine the truth of the matter,' but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A material fact is one which may make a difference in the outcome of the case. *Liberty Lobby*, 477 U.S. at 249. The opposing party must assert facts sufficient to show a dispute as to a material fact of an element of the argument for reformation or breach. *New Iraq Ahd Co.*, ASBCA No. 59304, 15-1 BCA ¶ 35,849 at 175,291-92 (citing *Mingus*, 812 F.2d at 1390-91) ("To ward off summary judgment, the non-moving party must do more than make mere allegations; it must assert facts sufficient to show a dispute of material fact."); *see Lee's Ford Dock. Inc.*, ASBCA No. 59041. 16-1 BCA ¶ 36.298 at 177,010.

*L3's Articulation of the Burden of Proof*

L3 discusses burden of proof several times:

> A decision sustaining these appeals is appropriate in accordance with Board Rule 17 (or in the alternative, Board Rule 7(c)) and binding precedent of the Board because the Government has plainly indicated an intention not to continue the defense of the appeals and has failed to meet its burden of proving the costs disallowed by the COFDs are unallowable.

(App. opp'n at 3)  L3 repeats this argument later in its opposition:

> A decision sustaining these appeals is appropriate in accordance with Board Rule 17, or in the alternative Board Rule 7(c), and binding precedent of the Board because the Government has plainly indicated an intention not to continue the prosecution or defense of the appeals and has not met its burden of proving the costs disallowed in the COFDs are unallowable.

(*Id.* at 34)  And:

> The facts in these appeals are analogous to those in *Centron*. The Government has essentially conceded that it cannot—or at least has no intent of trying to—meet its burden of proving the Government's cost disallowance claims asserted in the COFDs.

(*Id.* at 35)  And:

> To the extent the Board considers a default judgment sustaining the appeals a "sanction" under Rule 16—rather than the natural result of failing to defend the appeals or meet the Government's burden of proving the cost disallowance claims asserted in the COFDs—it is one that is "necessary to the just and expeditious conduct of the appeal" under Rule 16 and an entirely "appropriate action" under Rule 17.

(*Id.* at 36)

*FAR 31.201-3, Allocates the Burden of Proof to L3*

It is true that these are government claims and the government bears an initial burden but that burden is not as claimed by L3.  As I explain below the government's

29

burden is to challenge specific costs claimed by the contractor. In their briefs, neither L3 nor DCMA consider FAR 31.201-3, Determining reasonableness and how it operates to place the burden of proof on L3. Our interpretation is consistent with that of DCMA's COFDs (SOF ¶¶ 7-9).

FAR Part 31, Contract Cost Principles and Procedures, defines what costs are and are not allowable providing the standards applied by DCAA in its audits (SOF ¶¶ 4-5) and DCMA in its final decisions (SOF ¶¶ 7-9). As explained in *Boeing North American, Inc. v. Roche*, 298 F.3d 1274 (Fed. Cir. 2002), this Board is also obligated to follow FAR Part 31:

> Although a cost may be allocable to a contract, the cost is not necessarily allowable. We have agreed with the general proposition that "costs may be assignable and allocable under CAS, but not allowable under [FAR]." *United States v. Boeing Co.,* 802 F.2d 1390, 1394 (Fed.Cir.1986). [Footnote omitted] And the FAR makes clear that "[w]hile the total cost of a contract includes all costs properly allocable to the contract, the allowable costs to the Government are limited to those allocable costs which are allowable pursuant to [FAR] Part 31 and applicable agency supplements." FAR § 31.201–1(b) (2001).

(*Id.* at 1280)

FAR 31.201-2, Determining allowability lists five elements required to determine if a cost is allowable (SOF ¶ 1). One of the five elements is reasonableness defined by FAR 31.201-3 Determining reasonableness, which includes the following language in FAR 31.201-3(a):

> No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. *If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.*

(SOF ¶ 1) (Emphasis added)

When interpreting a procurement regulation, "we seek an interpretation consistent with the plain terms provided; it is not our prerogative to insert additional words or phrases to alter an otherwise plain and clear meaning." *Raytheon Company*, ASBCA No. 57576 *et al.*, 15-1 BCA ¶36,043 at 176,050. The language to be interpreted, quoted and italicized above, is, "If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the

burden of proof shall be upon the contractor to establish that such cost is reasonable." This language is unambiguous and has only one reasonable interpretation. It requires two actions by the government: (1) it must perform an "initial review of the facts," and (2) that review results in a "challenge" to "specific cost[s]" by a contracting officer or contracting officer's representative. If the government meets this initial burden, "the burden of proof shall be upon the contractor to establish that such cost is reasonable." DCMA employed this interpretation in its COFDs (SOF ¶¶ 7-9).

We interpreted FAR 31.201-3(a) in *Kellogg Brown & Root*, ASBCA, No. 58081, 17-1 BCA ¶ 36,595, where we recognized that contesting reasonableness "is significant because it shifts the burden of proof" to the contractor (*id*. at 178,240). We went on to hold that a general (blanket) assertion that all costs are unreasonable is insufficient to require the contractor to do more to prove reasonableness (*id.* at 178,250). I do not have such a blanket objection before me in these appeals. We have DCAA audits that challenge specific costs identified as unallowable and DCMA COFDs demanding repayment of those unallowable costs (SOF ¶¶ 7-9).

In *North American Landscaping, Construction and Dredge, Co.* (NALCO) ASBCA No. 60235, 18-1 BCA ¶ 37116 a separate concurring decision included the following footnote No. 29:

> The Federal Acquisition Regulation (FAR) has, on other occasions, permitted a CO's suspicions to trigger a requirement that a contractor provide more substantiation for certain costs. For example, in FAR 31.201-3, *all that is necessary to impose upon a contractor the burden of proof of demonstrating a particular cost to be reasonable is the CO's "challenge" of that cost after "an initial review of the facts."* FAR 31.201-3(a). Like the DFARS clause we have discussed above, this FAR provision does not go into detail about what is sufficient for the CO to bring such a challenge.

*NALCO*, 18-1 BCA ¶ 37116 at 180,659 n.29 (emphasis added). This footnote, although dicta, presents the interpretation of FAR 31.201-3(a) I followed in this case.

In *Parsons Evergreene, LLC*, ASBCA No. 58634, 18-1 BCA ¶ 37137, the trial judge employed the same interpretation of FAR 31.201-3(a) I discussed above that was applied in *Kellogg Brown & Root*, 17-1 BCA ¶ 36,595. *Parsons*, 18-1 BCA ¶ 37137 at 180,790. A concurring opinion took issue with the trial judge's conclusion that a blanket challenge to costs that failed to challenge specific costs was insufficient to require the contractor to do more to prove reasonableness. The concurring opinion concluded, "There was no requirement nor need to follow FAR 31.201 to evaluate this claim and thus, we concur in the result but not the analysis" *Parsons*, 18-1 BCA ¶ 37137 at 180,821. Again, I am not faced with such a blanket challenge in this case.

31

In *BAE Systems San Francisco Ship Repair*, ASBCA No. 58809, 14-1 BCA ¶ 35642, citing the Federal Circuit, we held that where the government has challenged specific costs, the contractor has the burden of proof to prove the costs it claims are reasonable:

> Interpreting FAR 31.201 -3(a), the Federal Circuit recently affirmed that the contractor has the burden of proof, unaided by a presumption of reasonableness, to establish that the costs it incurred were reasonable. *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348, 1363 (Fed. Cir. 2013) ("It seems that KBR seeks a presumption that it is entitled to reimbursement simply because it incurred facilities costs. It is not."). This Board has long so held. *See Northrop Worldwide Aircraft Services, Inc.*, ASBCA Nos. 45216, 45877, 98-1 BCA ¶ 29,654 at 146,934 (citing *Northrop Worldwide Aircraft Services, Inc.*, ASBCA No. 47442, 97-1 BCA ¶ 28,885).

(*Id.* at 174,534)

L3's repeated contention that the government has the burden to prove the costs challenged by DCAA and DCMA are unallowable is simply wrong. DCAA's audits and DCMA's COFDs satisfy the government's initial burden to conduct an initial review and contracting officer challenge of specific costs. Accordingly, pursuant to FAR 31.201-3(a), "the burden of proof shall be upon the contractor [L3] to establish that such cost is reasonable" (SOF ¶ 1).

*Disputed Material Facts Exist*

Thus far I have spent all of my time on the mootness exception and interpreting FAR 31.201-3(a) as it relates to the burden of proof. Such interpretation is a question of law. *States Roofing Corp. v. Winter*, 587 F.3d 1364 at 1368 (Fed. Cir. 2009). Questions of law are susceptible of resolution by summary judgment. *Dixie Construction Company, Inc.*, ASBCA No. 56880, 10-1 BCA ¶ 34,422 at 169,917. Although I resolved the interpretation / burden of proof questions of law issues, I cannot resolve L3's motion. Placing the burden of proof of allowability on L3 just clears the way for the parties to litigate the underlying factual matters in view of the proper allocation of burden of proof. DCAA and DCMA contend that the audit challenged costs are unallowable. L3 contends that the statistical analysis used in the DCAA audits is flawed[23] and the audit challenged costs are allowable. Whether costs are allowable is a question of fact. *Martin Marietta*

---

[23] I note that DCMA's expert, Mr. Arab, identified an error in DCAA's statistical analysis (sample size) that DCAA agreed with and implemented a change (SOF ¶¶ 16-18). I do not know if that cured the problem complained of by L3 or not, but L3 is entitled to proceed.

*Corp.*, ASBCA No. 15313, 71-1 BCA ¶ 8644 (Disputes as to whether certain kinds of incurred costs (e.g. interest, donations, independent R&D, etc.) are allowable under the contract are disputes concerning a question of fact arising under the contract provisions . . . .). Accordingly, I have disputed material facts that cannot be resolved by summary judgment.

*L3 is not Entitled to Summary Judgment that its Challenged Costs are Allowable*

Because the question of allowability of discrete costs involves disputed material facts, I would deny L3's motion and allow the litigation to proceed.

CONCLUSION

Based on the above, I would deny DCMA's motion to dismiss for mootness and L3's motion asking the Board to decide that its challenged costs are allowable. I would allow the appeals to proceed.

Dated: March 1, 2021

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61811, 61813, 61814, Appeals of L3 Technologies, Inc., rendered in conformance with the Board's Charter.

Dated: March 2, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals